William B. Brennan, Jr., J.
In this action, plaintiff Ferranti Electric, Inc., a New York corporation (hereinafter referred to as “Ferranti”), which is a wholly-owned sub *534 sidiary of Ferranti, Ltd., a British concern, seeks a permanent injunction against the defendants restraining them from engaging in the manufacture and sale of magnetostrictive delay lines, from communicating plaintiff’s trade secrets in respect thereof to others, and from any endeavor to sell said devices to plaintiff’s customers.
Ferranti, since the year 1957, has been engaged in the development, production and eventual sale of longitudinal and torsional magnetostrictive delay lines, which are memory devices used as component parts of certain radar installations and computers. It claims that its former employees, the defendants Harwood, Lindemann and Sapsowitz entered into a conspiracy with the defendant Wild, president and sole stockholder of the defendants Digital Devices, Inc. (hereinafter referred to as “Digital”) and Wild and Associates, Inc. (hereinafter referred to as “Associates”) to appropriate plaintiff’s trade manufacturing processes for their own use and in violation of the confidence under which Harwood had learned of these processes. All defendants deny any conspiracy or breach of confidence and all maintain, further, that the processes relied upon by the plaintiff do not constitute trade secrets and, accordingly, should not be protected as such.
The defendant Harwood, previously employed by the parent company in England, joined Ferranti in 1957. A graduate engineer, he was in large part responsible for inaugurating plaintiff’s delay line program, and later as chief engineer became fully familiar with the over-all production and manufacturing techniques employed by the plaintiff in producing magnetostrictive delay lines. Defendants Lindermann and Sapsowitz joined Ferranti in 1959 and 1960, respectively, and each worked in an engineering capacity of some importance. All three became employees of Digital in the month of August, 1962, and within approximately two months thereafter six additional Ferranti employees, technicians, assemblers, machinists and draftsmen, also left plaintiff’s employ and were hired by Digital.
The defendant Wild was, in the year 1961, the president of Associates, which concern acted as sales representative for a number of manufacturing concerns in the field of electronic memory devices. Associates represented companies producing all types of said devices with the single exception of magnetostrictive delay lines. Wild became interested in the delay line field in 1961 and attempted to establish a sales representative relationship with Ferranti in that year. This never materialized due to the fact that another company which Associates repre *535 sented was in competition with Ferranti in connection with a different device. In October of 1961, one Fahnestock, an associate of Wild, was chairing a symposium on memory devices and contacted Mr. Davies, general manager of Ferranti, with a view toward having one of Ferranti’s employees give a short lecture on delay lines. Harwood was asked by Davies to perform this service, and, significantly, was in no way restricted or confined in the manner in which he would approach the topic. Wild first met Harwood on that occasion and, apparently impressed, invited him to lunch approximately one month later, at which time a general discussion took place about the performance of delay lines.
It does not appear that any further meeting between Harwood and Wild occurred until June of 1962. During this six-month period Wild, having been unsuccessful in obtaining a sales representative relationship with any delay line manufacturer, decided to reactivate a then dormant Wild Corporation, Digital, and to embark upon the production of delay lines. In furtherance of this plan, he hired one Wicks who up to that time had been employed by Control Electronics Corporation, one of Ferranti’s competitors in the delay line field. Wicks went on the payroll in January, 1962, and proceeded to assemble six or eight magnetostrictive delay lines which he used to demonstrate to the sales force of Associates the functions and performance of this type of memory device.
In June of 1962, Wild was ready to go into production, and it was at this juncture that he again contacted Harwood. Wild was considering hiring a production engineer for delay line manufacture and wanted Harwood’s professional evaluation of certain named individuals who were under consideration. At this point Harwood, who was disenchanted with the management at Ferranti, indicated to Wild that he himself might be interested in a new association. Two days later, Wild called Harwood and made him a firm offer of $20,000 a year to join Digital as vice-president and general manager, the salary representing an increase of $5,000 over what Harwood was earning at Ferranti. Harwood did not immediately accept the offer, but returned to England to discuss with the parent company the possibility of returning to its employ. On August 6, he accepted Wild’s offer and joined Digital on August 13, 1962.
When Sapsowitz and Lindemann, who were also dissatisfied with conditions at Ferranti, heard of Harwood’s departure, they contacted him directly and requested employment. Within a few days they were both hired by Digital and given salary increases.
*536 The issues presented for determination are: first, whether the processes relied upon by Ferranti constituted trade secrets, and, second, whether or not there was any wrongful misappropriation of those processes by Harwood, Lindemann and Sapsowitz. After some 18 days of trial, during which almost 3,000 pages of testimony were taken and during which literally hundreds of exhibits were admitted in evidence, the court concludes that plaintiff’s processes were not trade secrets entitled to protection and that, in any event, there was no wrongful misappropriation.

Plaintiff’s Processes

It is not claimed that the end product, i.e., the longitudinal or torsional magnetostrictive delay line, is a trade secret. Plaintiff claims, however, that, as a result of substantial capital investment and a laborious and painstaking period of trial and error, it has developed manufacturing and testing techniques which are entitled to protection, has developed sources of supply of specific materials which are secret and entitled to protection, and has a customer list which is entitled to protection.
The customer list can be disposed of summarily. It is in no way a trade secret, but a compilation of the largest and best-known companies and concerns in the electronics field in this country. All of them were known to Wild years before Harwood’s arrival, and to call such a list secret is ludicrous.
Aside from customer lists, plaintiff claims no less • than 45 trade secrets and these 45 would seem to involve every step in the entire process of production. It is thus not a particular special process or even a group of special processes which is claimed as a secret, but the entire body of knowledge assimilated by Harwood, Lindemann and Sapsowitz during their years with Ferranti. This is perhaps the essential difficulty with plaintiff’s position in this case.
There are some 10 or more companies which produce magnetostrictive delay lines, and since no commercially usable delay line can be produced without heat-treated wire, wire supports, transducer assemblies with magnets and bobbins, damping pads, base plates and covers, and nickel tape, it must be assumed that these companies employ all of these component parts in their respective shops. Moreover, it is known that no commercially usable delay line can be produced without elaborate tests for determining electronic performance, degrees of shock and vibration, and temperature coefficients of delay and amplitude. Without such tests it would be impossible to *537 meet the specifications of customers. (It must be emphasized in this connection that a delay line is not a standardized product mass produced for a general market, but a commodity built to varying customer specifications, in limited numbers, on a contract basis.) The proof clearly establishes that each of the afore-mentioned component parts and each of the aforementioned types of test are indispensable to the production of any delay line and it is conceded that the delay line itself is not a trade secret. It would thus appear that none of the component parts and none of the types of tests are themselves trade secrets.
What plaintiff has offered in support of its case is far more abstruse. It has offered no proof to the effect that any component part or any test type is secret, but rests its case on extensive proof as to the precise method of acquisition of each of the components, the precise methods of assembly of the components, and the detailed methods utilized in performing the tests. It is thus claimed, in effect, that it is not what plaintiff makes that is secret, but how it makes it, and from whom it gets the material with which to do so.
Thus, Ferranti relies heavily upon its source of wire supply as a trade secret. It maintains that after much trial and error it settled upon one particular company as its wire supplier. It claims, further, that it, rather than the supplier, specifies the physical characteristics of the wire and the process and degree of cold reduction of the wire. Both the source and the specifications are said to be secret, but the evidence is to the contrary. The source has been advertised rather extensively, is used by many of plaintiff’s competitors, was known to Digital through Wicks before Harwood’s arrival, and is not even used by Digital at the present time. The physical characteristics of the wire are more or less standardized, the wire having a recognized trade name and a known metallic composition, and plaintiff’s specifications for degree of cold reduction call for no more than minor variations from the standards set by the supplier itself. Ferranti’s specifications have not been demonstrated as having resulted in a significantly improved type of wire over that which could be obtained by relying upon the supplier’s own specifications. The source is not secret and the specifications are insignificant.
Another general area said to be secret is that involving the electrical heat treatment of wire after it is received at Ferranti’s plant. The manner in which the wire is rigged, the environmental conditions under which the treatment takes place, the current and voltage used, and the particular degree of control *538 of the current and voltage, the length of time the wire is subjected to the treatment and the machinery by which and the manner in which the tests for temperature coefficients of delay and amplitude are carried on, are all relied upon as being trade secrets. It is probable, and not surprising, that the precise methods used by Ferranti in each of these areas are somewhat different than those used by its competitors. What is most striking, however, is not the differences but the similarities. Before Wicks went with Digital, he had been employed by Control Electronics, one of Ferranti’s competitors, and his testimony, which the court fully credits, establishes that Control used the same basic heat-treating and testing procedures as Ferranti. There certainly were refinements achieved' by Ferranti through the years, but not one of these impresses the court as being so unique or esoteric as to merit ‘ ‘ trade secret ’ ’ status. There is a hierarchy of importance among the functions performed in the production of a complicated electronic device and certainly not every single function and every single manner of performance can attain that majesty which entitles it to protection. The various refinements relied upon by the plaintiff do not meet the qualitative tests. There is nothing arcane about any of them. In short, they are refinements, but they do not possess that special characteristic which represents a substantial, novel, important or significant improvement in the art. (See Sarkes Tarzian, Inc. v. Audio Devices, 166 F. Supp. 250, 265.)
The same may be said of the multitudinous techniques of production, assembly and testing which plaintiff claims as its trade secrets. It is not a wire bracket or support that is claimed as a secret, but a “particular design” thereof; not a transducer assembly or a bobbin or magnet used therein that is alleged as a secret, but the ‘ ‘ particular dimensions,’ ’ of the magnet or the “particular method” by which the wire is wound around the bobbin; not the fact that nickel tape is welded to the wire that is secret, but the ‘ ‘ particular manner ’ ’ in which the weld is made, and the manner in which the protruding ends are cut off after the weld (in this case with a scissors); and not that a damping pad is a secret but that it is assembled in three layers rather than four. All of these techniques of production, assembly and testing were either in the public domain through publication in trade journals and periodicals, and/or known to Wicks and, therefore, to Digital, before Harwood’s arrival, or are such insignificant departures from what was generally known as not to merit protection. They are at best the normal result which one would expect to flow *539 from the general knowledge, expertise and intelligence of any good manufacturer. (See Richard M. Krause, Inc. v. Gardner, 99 N. Y. S. 2d 592.) To put it another way, the production of a magnetostrictive delay line involves certain indispensable steps. These steps must be performed in one way or another by any manufacturer of the finished product. Plaintiff has not established that it performs any of these steps in a manner so unique, or with results so spectacular, as to warrant the classification of any such step as a trade secret.
It has been observed time and again that a trade secret is difficult if not impossible of exact definition, but the attributes or indicia of a trade secret are succinctly set forth in the Restatement of Torts, quoted with approval in Minnesota Min. & Mfg. Co. v. Technical Tape Corp. (23 Misc 2d 671, 679 affd. 15 A D 2d 960): “ ‘ The subject matter of a trade secret must be a secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the° business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one’s trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.’ ” (Emphasis supplied.)
In applying these tests to the many items relied upon by plaintiff as constituting its trade secrets in this case, the court concludes: (1) That a substantial body of technical knowledge in the production, assembly and testing of magnetostrictive delay lines is in the public domain and known to many, if *540 not all, of plaintiff’s competitors. Articles in technical publications and trade journals received in evidence, together with Wicks ’ testimony of the procedures used by Control Electronics clearly support this view. (2) That all these procedures were known generally to all of Ferranti’s employees and many of its former employees who left its employ previously to take positions with other competitors. (3) That with the possible exception of its source of wire supply, Ferranti took little or no precautions to guard its alleged “ secrets ” from anyone. (4) The various techniques employed by Ferranti are certainly valuable, but their value is no more than that which would be reasonably expected in any similar going concern. (5) The amount of money expended by Ferranti in improving its production techniques, though not an insubstantial sum, was to a very large extent subsidized by the United States Government which granted Ferranti many prototype contracts which were essentially for research and developmental work rather than production. (6) That most of the information could be properly acquired by other knowledgeable people in the electronic field through perusal of the published technical data, and Ferranti’s own reports to the United States Government which are, by virtue of the Armed Services Procurement Regulations, themselves in the public domain. Balancing these factors, the court finds that none of the items relied upon by the plaintiff can properly be called trade secrets entitled to protection within contemplation of the law.
To determine in the abstract what is or is not a trade secret is admittedly a difficult judicial function. Perhaps because of this the courts have consistently placed emphasis not so much upon the thing allegedly taken as upon the manner in which it was taken and the breach of faith involved. As stated by Chief Judge Holmes in Du Pont Powder Co. v. Masland (244 U. S. 100, 102): “ Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him.” (Emphasis supplied.) See, also, Volume 77 of Harvard Law Review Developments in the Law — Competitive Torts (p. 888) at page 948:
*541 “In sum, limited protection for trade secrets seems desirable, primarily to discourage ‘ unfair ’ methods of taking and secondarily to provide incentive to invest. It follows that in asking whether a trade secret deserves protection the courts should first look at the means by which it was acquired. If the methods used involved an independently recognized social harm, then the ‘ deterrent-unwarranted enrichment ’ argument is conclusive in favor of protection. If the means cannot immediately be classified as ‘ wrongful, ’ as when an employee reveals information which arguably may be a part of his job skills, then the court is remitted to additional factors, such as the need for mobility of skilled employees and for investment incentive.” (Emphasis supplied.)
Thus, improper conduct and breach of faith resulting in unfair competition is at the threshold of every trade secret case and it cannot be pretended that reprehensible conduct when found does not in and of itself assist in the classification of the thing taken as being a trade secret. It is precisely in this area that plaintiff’s case fails most completely,
It must be remembered that neither Harwood, Sapsowitz nor Lindemann had any written contract of employment with Ferranti. They were in the true sense employees at will and could be let go or fired at the whim of the employer. Moreover, not one of them signed any covenant not to compete, and none of them signed any technical agreement concerning the revelation of trade secrets or secret processes. They left plaintiff’s employ as they had every right to do, and there is no evidence whatsoever of any preconceived plan or conspiracy on their part or on the part of Wild. Plaintiff wishes the court to go beyond the simple fact of the departure of these employees, speculate about improper motivation and translate their conduct in terms of evil. There is no justification for this and no evidence in the record from which an evil motive could be inferred. Thus, while the departure of Ferranti employees and the subsequent hiring of these same employees by Digital is such as to raise the eyebrow of suspicion, yet there is clearly no evidence of conspiracy, no evidence of any attempt by Wild to induce any breach of an employment contract, no evidence of any purloming..pf._papers, filching of formulae or taking of tangibles, and there is no breach of any written agreement. All of the actions of Harwood, Lindemann and Sapsowitz, and the lack of proof of any other actions on their part, are as consistent with the normally expected desire for fair, economic self-improvement as they are with a well-planned, well-con *542 cealed conspiratorial attempt at industrial piracy. There was here no outright stealing of tangible property and records as there was in Sealectro Corp. v. Tefco Electronics (32 Misc 2d 11). There was here no furtive copying of complicated formulae or cunning concealment of the new employment from the old employer, as there was in Minnesota Min. & Mfg. Co. v. Technical Tape Corp. (23 Misc 2d 671, affd. 15 A D 2d 960 supra.) There was here no statement, or no attitude manifested to the effect that loyalty and ethics had their price and the price was being paid, as there was in Goodrich Co. v. Wohlgemuth. (192 N. E. 2d 99, 104 [Ohio].) There was here no brazen theft as there was in Defler Corp. v. Kleeman (19 A D 2d 396). Moreover, there was no attempt whatever on Harwood’s part to conceal from his employer his intended departure and, even more significantly, upon informing plaintiff’s general manager Davies of his decision, Harwood was in no way informed of any “ trade secret ” claim nor was his departure attempted to be enjoined. He was only told that he might lose his pension rights.
The plaintiff has clearly failed in its burden of proof. There are no trade secrets. There is no conspiracy. There is no wrongful misappropriation. The complaint is dismissed, with costs to the defendants.
The foregoing constitutes the decision of the court required by CPLB 4213. All motions upon which decision was reserved at the trial are resolved in accordance with the foregoing. Settle judgment on notice.