**SPERRY RAND CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**PENTRONIX, INC., a Michigan corporation**

**Robert A. Brinker, Robert W. Beyer, James Mulhollan, Defendants.**

**Civ. A. No. 43109.**

United States District Court, E. D. Pennsylvania.

March 18, 1970.

Thomas M. Ferrill, Jr., R. Norman Coe, Philadelphia, Pa., for plaintiff.

Nelson E. Kimmelman, Philadelphia, Pa., for defendants.

## OPINION

DAVIS, District Judge.

### Discussion

The defendant Pentronix, Inc. hereinafter referred to as Pentronix manufactures magnetic memory cores at its facility in Frazer, Pennsylvania. In this diversity action, the plaintiffs are asserting that Pentronix, together with three key employees have been engaging in unfair competition. In addition, the three individual defendants are accused of having breached their contractual agreements with Sperry Rand, (hereinafter referred to as Sperry) by whom they were previously employed. Specifically it is asserted that the individual defendants have appropriated Sperry's trade secrets, i. e., information regarded as confidential and proprietary, in order to establish a competing magnetic memory core manufacturing facility. The plaintiff seeks injunctive relief, damages and an accounting of profits realized by the defendants. Although this matter came to be heard *in camera* in the form of a motion for a preliminary injunction, the parties have fully and finally argued their respective positions and have asked the Court to determine the motion for permanent injunction, as authorized by Federal Civil Rule 65.

The subject matter forming the basis of this lawsuit is an electronic device called a magnetic memory core. These devices which range in size from 18 to 80 mils (thousandths of an inch) are used in the manufacture of electronic computers. The magnetic memory core is the device which essentially performs the function of storing information. This is accomplished by passing electrical signals or impulses through specific combinations of the wires upon which the cores have been connected. The electrical signal magnetizes the selected core. When information is desired or retrieved, the direction of the current is essentially reversed. This results in magnetizing the core in the opposite direction of polarity. When this is done, a "re-out" signal is induced, thereby enabling the retrieval of information. Normally magnetic memory cores are affixed to a "plane" or board which has a square configuration containing 64 magnetic memory cores in each row, for 64 rows. However, if one core is defective, practical considerations dictate that the entire plane be discarded. Quality control at the time of manufacture with respect to the electro-magnetic characteristics of each core, becomes critical. Accordingly, great emphasis is placed upon effective testing and calibration equipment. The price of loose (i. e. not mounted on planes) magnetic memory cores may vary from as low as $3.25 per thousand to $6.00 per thousand.

The manufacturing of magnetic memory cores is relatively complicated. The selection and proportion of ingredients, as well as the processing, are rigidly controlled, again in order to assure that the desired physical and magnetic characteristics are accomplished in a uniform manner.

The plaintiff has successfully demonstrated that it has been engaged in the research and development of a commercially effective process for the manufacture of magnetic memory cores, since 1954. Production in commercial quantities commenced in 1962. It is Sperry's position that the process for manufacturing magnetic memory cores which it has developed during these years is not only proprietary, but also has been regarded as company confidential. It therefore asserts that the design, development, manufacture, and testing of its magnetic memory cores may properly be characterized as a trade secret. Specifically, Sperry claims the following categories of information to be confidential:

1. The formulations (ingredients and proportions) of its magnetic memory cores.

2. Its system of processing the powder to be pressed into cores.

3. The specific dimensions of tooling used in pressing cores into various sizes (some cores are no larger than a period).

4. Its techniques for sintering and quenching the cores.

5. Its core testing technique.

6. Its core testing equipment.

7. Core marketing information.

In contrast to the rather comprehensive research and development program which Sperry undertook in order to develop an operational and commercially feasible magnetic memory core and manufacturing facility, the defendant Pentronix entered the field in less than 5 months. Pentronix was able to induce three key Sperry personnel (the individual defendants) to terminate their relationship with Sperry and form the vanguard of the Pentronix facility.

The defendant Beyer was formerly the manager of Sperry's magnetic memory core operation. The defendant Brinker had extensive experience at Sperry in the critical area of magnetic memory core testing. He was the supervisor of electrical testing at Sperry. In addition, after Beyer left the employ of Sperry, Brinker was placed in charge of Sperry's entire magnetic memory core group. Finally, the defendant Mulhollan was Sperry's supervisor of manufacturing engineering; again in the magnetic memory core group. The three individual defendants had an intimate knowledge of Sperry's entire magnetic memory core manufacturing process.

The crux of the defendants' position is essentially two-fold:

First, the manufacturing process (and ancilliary equipment) used at Sperry was not a "trade secret" but is the result of the application of ordinary well-known engineering principles. In addition, Pentronix asserts that its process in force is not identical to Sperry's.

It should be noted at the outset, that Sperry's accusation that the individual defendants removed a substantial number of physical documents and other equipment from Sperry's facility prior to their departure is not seriously disputed.

While both sides have rather comprehensively set forth a rather diverse interpretation of the applicable law, this Court is, of course, required to follow the law of Pennsylvania. Thiberg v. Bach, 107 F.Supp. 639 (D.N.J.1952), citing Campbell Soup Co. v. Armour & Co., 175 F.2d 795 (3rd Cir. 1949). In the instant case, the plaintiff is asserting essentially two separate theories of liability:

First, that the individual defendants breached a written agreement not to reveal information of a confidential nature which they acquired by reason of their employment with Sperry. In addition, the existence of this covenant was related to the corporate defendant, shortly after Sperry became aware of the fact that it had hired the three individual defendants. Sperry also is asserting that all defendants have committed the tort of unfair competition. Pursuant thereto, this Court is aided by the guidelines stated in MacBeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 86 A. 688 (1913), and reiterated in Van Products Co. v. General Welding and Fabricating Co., 419 Pa. 248, 259, 213 A.2d 769, 775 (1965):

> To be entitled to equitable relief the burden was on [the employer] to show; (1) That there was a trade secret * * * or * * * a secret process of manufacture; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and, (4) that the secret was communicated to [the employee] while he was employed in a position of trust and confidence, under such circumstances as to make it inequitable and unjust for him to disclose it to others or to make use of it himself, to the prejudice of his employer.

■ Our inquiry then must first proceed to the threshold question in this

case: does Sperry in fact, have a trade secret? It is clear that the plaintiff Sperry has the burden of showing that it possesses a legally protectable trade secret, as well as some legal basis (either a restrictive covenant or by virtue of a confidential relationship between it and the former employees) upon which to predicate relief. Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430 (1960).

■ The concept of trade secret has been defined as "at best a nebulous one", *Van Products Co.* supra 419 Pa. at p. 258, 213 A.2d 769. The decisional law in Pennsylvania follows the Restatement of Torts, Section 757. Comment B to that section states that "a trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Applying this to the instant case, there is little doubt that Sperry possesses a "formula * * * or compilation of information" which it uses in its business. There is also ample information to permit this Court to conclude that this information permits Sperry to enjoy an advantage over competitors. There is substantial controversy, however, as to whether its competitors know or use this information. It is clear that in Pennsylvania as well as the preponderance of jurisdictions throughout the United States, matters of public knowledge or of general knowledge in industry cannot be appropriated by one as his secret. Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430 (1960).

Much effort has been devoted by the defendant to the question of whether Pennsylvania subscribes to the "whole picture" theory as set forth in Smith v. Dravo Corp., 203 F.2d 369 (7th Cir. 1953.) [1]

They would ask us to examine in the aggregate all of the formulae, processes and equipment which Sperry is asserting as trade secrets, and if some portions thereof can be shown to be in the public domain, then no trade secret exists.

It is true that certain portions of Sperry's processes, formulae and equipment are clearly in the public domain. However, this Court concludes that these matters are merely superficial and of no commercial significance, and does not conclusively negate the existence of a legally protectable trade secret, as the defendants would ask us to hold.

■ Even applying the standard as set forth in Ferranti Electric, Inc. v. Harwood, 43 Misc.2d 533, 251 N.Y.S.2d 612 (1964) which the defendants vigorously assert, there is ample evidence of the existence of a trade secret. In *Ferranti*, the Court was concerned with whether the refinements relied upon by the plaintiffs would possess "that special characteristic which represents a substantial, novel, important or significant improvement in the art." Supra at p. 617 of 251 N.Y.S.2d. The *Ferranti* court would analyze each technique of production, assembly and testing, against information clearly in the public domain e. g. by way publication in trade journals, periodicals, etc. This is not inconsistent with the approach followed by this Court. However, we also believe that the matters regarded as trade secrets of the plaintiff should appropriately be considered in each of the seven categories set forth in the beginning of this Opinion. The following findings of fact and conclusions of law will be predicated upon this classification.

### Findings of Fact

*Jurisdiction and Parties*

1. Plaintiff Sperry Rand Corporation (hereinafter referred to as "Sperry"), is a corporation incorporated under the laws of the State of Delaware. It has its principal corporate office in New York, N. Y. Magnetic memory cores are designed, developed and manufactured by the UNIVAC Division of Sperry Rand Corporation (hereinafter

1. See also 208 F.2d 388 (7th Cir. 1953).

referred to as "UNIVAC") which has an office and plant facilities in Montgomery County, Pennsylvania.

2. Defendant, Pentronix, Inc. (hereinafter referred to as "Pentronix") is a corporation incorporated under the laws of the State of Michigan. Pentronix is and has been doing business within the Eastern District of Pennsylvania since at least January, 1967.

3. Defendant Robert W. Beyer (hereinafter referred to as "Beyer") was employed by Sperry from August 24, 1959 to November 18, 1966 and is now an employee of Pentronix. Beyer resides within the Eastern District of Pennsylvania.

4. Defendant Robert A. Brinker (hereinafter referred to as "Brinker") was employed by Sperry from July 16, 1951 to February 17, 1967. He was then an employee of Pentronix until May 7, 1968. Brinker resides within the Eastern District of Pennsylvania.

5. Defendant James Mulhollan (hereinafter referred to as "Mulhollan") was employed by Sperry from February 6, 1961 to February 3, 1967. He was then an employee of Pentronix until May 7, 1968. Mulhollan resides within the Eastern District of Pennsylvania.

6. This Court has jurisdiction pursuant to Title 28, U.S.C., Section 1332 since there is diversity of citizenship and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of Ten Thousand Dollars ($10,-000).

*Subject Matter in Controversy*

7. The subject matter in controversy is confidential technical information involved in the manufacturing, testing and marketing of magnetic memory cores which are extensively used in electronic data processing devices. These magnetic memory cores, which may range in size from 18 to 80 mils (thousandths of an inch) are made from a mixture of powdered ingredients bonded together into rigid doughnut-shaped cores. See D. Ex. 22. From two to five different ingredients are used in making the various types of magnetic memory cores. The choice of ingredients, the number of ingredients, their proportions and the mixing technique applied to these ingredients are all rigidly controlled since they affect the physical and magnetic characteristics of the ultimate magnetic memory core. The manufacture of magnetic memory cores is accomplished by a particular sequence of steps whereby a mixture of ingredients is specially prepared and then pressed into doughnut configurations of controlled dimensions. These tiny doughnuts are sintered, by heating or "firing" at high temperatures. The sintering operation not only affects the final dimensions, hardness and density of the magnetic memory cores, but also affects the magnetic properties of the cores. Thereafter, the sintered cores are quenched under controlled conditions which affect the final properties of cores. Each magnetic memory core is then subjected to performance tests. (N.T. pp. 199–202; 183–188; 1774–1781).

8. After magnetic memory cores have been fabricated and tested, they are normally strung upon vertical wires, horizontal wires, and diagonally disposed wires to form a memory core plane. These memory core planes are used in electronic data processing devices for the storage of information. Information is stored in the magnetic memory cores by passing electrical signals through selected wires upon which they are strung. The magnetic flux generated by the electrical signals magnetizes selected cores depending upon the selected wires energized. Retrieval of the stored information can be accomplished by selectively reversing the direction of the electrical signals passing through the wires upon which the cores are strung. Accordingly, flux generated by the reversed current is also reversed and hence the magnetic cores are magnetized in the opposite direction. This last phenomenon is identified as "switching" a core and it induces a read-out signal in the diagonally disposed wires, thereby

enabling a retrieval of information (N.T. pp. 34–36, 1337–1338).

9. It is important that the respective magnetic memory cores, in a given memory core plane, have substantial uniformity with respect to their electromagnetic characteristics. A defective magnetic memory core in a memory core plane, having a square configuration with 64 magnetic memory cores in each row and each column, would require either that each of the 4,096 magnetic memory cores be tested to determine the defective ones and thereafter the memory cores restrung, or that the memory core plane be scrapped. Thus, during the manufacture thereof, each magnetic memory core must be individually measured physically and individually tested electrically and magnetically before it is strung in a memory core plane. (N.T. pp. 36–37).

10. A typical price for magnetic memory cores is about $4.00 per thousand cores. Extremely competitive pricing for volume orders may be as low as $3.25 per thousand cores while magnetic memory cores having certain desired temperature characteristics may be priced in excess of $6.00 per thousand cores. (N.T. p. 35; P. Ex. 43, p. 8).

*Sperry's Magnetic Memory Core Operation*

11. Sperry has been engaged in research and development efforts on magnetic memory cores continuously since 1954 and has engaged in mass production of magnetic memory cores since 1962. (N.T. pp. 799, 1789, 2009–2012).

12. From the commencement of its magnetic memory core effort in 1954, through the time that it developed a capability to successfully mass produce magnetic memory cores in 1962 and thereafter, Sperry relied upon a team, consisting of several engineers and technicians in its employ. This team devoted its full time to experimenting, engineering, designing with respect to materials, process steps and test techniques in order to bring about the mass production of magnetic memory cores of acceptable quality and consistency and in order to so produce cores with sufficiently high yield (percentage of the resulting cores proven acceptable by test) and production efficiency to assure economic success. (N.T. pp. 799, 804–806, 2009–2011).

13. From its development in the field of magnetic memory cores Sperry has acquired confidential information, including trade secrets, relating to the designing, developing, making, testing and marketing of magnetic memory cores and Sperry has protected said confidential information for its own use. Included among the significant information of which Sperry is possessed are particular formulations (ingredients and proportions) for certain types of magnetic memory cores, a particular system of processing steps for preparing the powder to be pressed into cores, specific press tooling dimensions for different core sizes, techniques for sintering and quenching, a superior core testing technique and unique testing equipment, and marketing information relating to core types, customers, number of sales and market planning. (N.T. pp. 192–193, 343, 528–530, 561–563, 815–817; P. Ex. 48, 84A, 86A, 87A, 88A, 97, 98; D. Ex. 22).

14. Sperry continued to acquire and develop confidential information relating to the design, development, manufacture, testing and marketing of magnetic memory cores which it protected for its own use and by late 1966 attained the position of being the third or fourth largest manufacturer of magnetic memory cores in the United States. (P. Ex. 43, p. 2).

15. In December, 1966 Beyer, the former manager of Sperry's magnetic memory core operation, and Pentronix agreed to establish a magnetic memory core manufacturing plant in Frazer, Pennsylvania. Further, Beyer and Pentronix agreed upon a plan to proceed within five months to manufacture and sell magnetic memory cores. (Beyer Dep. pp. 22–24, 28–30; Smith Dep. pp. 14, 24, 26; P. Ex. 2; 43, p. 5).

16. At the time Pentronix agreed with Beyer to establish a magnetic memory core division, Pentronix was less than one year old. It had not been engaged in the manufacture or sale of magnetic memory cores, and it did not have any key personnel with the requisite knowledge or necessary experience to commence making and selling magnetic memory cores. (N.T. pp. 349–350; Beyer Dep. pp. 16 and 56; Smith Dep. pp. 29–30; Paragraphs 14 of each the Complaint and Answer).

17. On or about January, 1967, pursuant to its agreement with Beyer to engage in the manufacture and sale of magnetic memory cores Pentronix established a plant in Frazer, Pennsylvania.

18. On January 11, 1967, Pentronix' entire Board of Directors met with the individual defendants and Frank Ash (Frank Ash was, and still is, Sperry's Sales Manager for magnetic memory cores and was the fourth member of Sperry's team of key personnel in whom Pentronix was interested), at the Marriott Motor Hotel on City Line Avenue in the Philadelphia area for the purpose of making specific offers to Brinker, Mulhollan and Ash. (Beyer Dep. pp. 31 and 36; Smith Dep. pp. 97–98; Brinker Dep. p. 54; Smith Dep. p. 98).

19. Each of these key Sperry employees was offered higher salary and a substantial percentage of the profits. The combined salaries of the three individuals employed by Pentronix, viz., Beyer, Brinker and Mulhollan, totaled Sixty Thousand Dollars ($60,000) a year and 21% of the profits. The profit-sharing arrangement was a type of consideration not offered to Pentronix' other key employees. Beyer's salary was set at $24,000 per year plus 8% of the profits; Brinker's salary was set at $20,000 per year plus 7% of the profits and Mulhollan's salary was set at $16,000 plus 6% of the profits. After the 18th month Beyer's proposal predicted an annual gross profit of $924,000. Thus, the amount the individual defendants were to receive was roughly four times their salary, although it was indicated that a sliding scale was in effect to lessen the amounts. (Beyer Dep. pp. 184–185 and 560.)

20. The president of Pentronix placed considerable reliance on Beyer's technical knowledge as to magnetic memory cores in hiring him, and the motive for employing Brinker and Mulhollan was to get them "to bring their know-how". The pertinent know-how to which Beyer, Brinker and Mulhollan had access was plaintiff's know-how, including its confidential and trade secret information. (N.T. pp. 103, 105, 106, 1055–1060; Brinker Dep. pp. 55, 196; P. Ex. 84A; Smith Dep. pp. 64, 66, 102).

21. Up to the dates of their respective resignations from Sperry, defendants Beyer, Mulhollan and Brinker were key personnel in the employ of Sperry and were entrusted with its confidential information and trade secrets relating to the design, development, manufacture, testing and sale of magnetic memory cores. (Beyer Dep. pp. 56, 111–114; Brinker Dep. p. 297, and Mulhollan Dep. pp. 40–42.)

22. Each of these individual defendants acquired his knowledge of, and his experience in, the manufacturing and testing of magnetic memory cores while employed by Sperry and under the tutelage of its employees who had developed the techniques used by Sperry to manufacture and test magnetic memory cores. (Beyer Dep. pp. 88–90; N.T. pp. 358, 1789–1790; Mulhollan Dep. pp. 29–30, 37–39).

23. Beyer is a graduate electrical engineer. Between August 1959 and late 1962, he was engaged in work at Sperry not connected with magnetic memory cores. At the end of 1962, Beyer started working in Sperry's Magnetic Memory Core Group, which was then some eight years old. As Beyer worked in the Magnetic Memory Core Group he was taught Sperry's procedure for making magnetic memory cores by his superior, Hufnagel. (N.T. pp. 443–444), and, he became di-

rectly involved with powder processing and continued in this work until about the middle of 1964, when he was transferred to another Sperry group. At the end of 1964, Beyer was transferred back to Sperry's Magnetic Memory Core Manufacturing Group and placed in charge of that group with some 125 employees under his supervision. (N.T. p. 379; Beyer Dep. pp. 444–445).

24. From 1951 to 1957, Brinker worked at Sperry on various electrical circuits, amplifiers, transformers, and other projects. In 1957, he was brought into Sperry's Magnetic Memory Core Group, which was then approximately three years old. During his last two or three years at Sperry, Brinker reported first to Richard Hill, who developed Sperry's cancellation testing equipment and was in charge of testing magnetic memory cores, and then to Beyer. Brinker eventually became Sperry's Supervisor of Electrical Testing of magnetic memory cores under Beyer. After Beyer left Sperry's employment late in November of 1966, Brinker was placed in charge of Sperry's Magnetic Memory Core Group. (Brinker Dep. pp. 5–7, 31–32; Beyer Dep. p. 325; Par. 10 of Complaint and Answer).

25. Mulhollan worked at Sperry for four years in manufacturing engineering before being transferred in March of 1965 to Sperry's Magnetic Memory Core Group, which was then eleven years old. Mulhollan was Sperry's Supervisor of Core Pressing under Beyer and became Supervisor of Manufacturing in the Magnetic Memory Core Group when Beyer left Sperry's employ. (Mulhollan Dep. pp. 37–38, 137).

26. Each of the individual defendants signed an Employee Confidential Information Agreement in which he agreed not to disclose or use Sperry's confidential information acquired or originated during their employment by Sperry. Each agreement provided in pertinent part as follows:

"EMPLOYEE CONFIDENTIAL INFORMATION AGREEMENT"

"In consideration of my employment or the continuation of my employment by Sperry Rand:

1. For a period corresponding to the term of my employment and thereafter, I shall not disclose to others or use, except as authorized by Sperry Rand, any confidential information of either Sperry Rand or any division of subsidiary thereof that I may acquire or originate during my employment.

2. Upon termination of my employment I will surrender to Sperry Rand any and all documents that I have in my possession incorporating any such confidential information." (Par. 11 of Complaint and Answer).

27. Beyer, Brinker and Mulhollan, immediately prior to their termination of employment, each reconfirmed and acknowledged their contractual agreements with and obligations to Sperry by signing an acknowledgement copy of a letter which provided in pertinent part:

"This is to remind you that you have a contractural obligation, which continues after your employment, not to disclose or use any confidential information of the Sperry Rand Corporation or any of its subsidiaries or division.

This obligation applies also to confidential material which you personally invented, originated or prepared. (P. Ex. 4; P. Ex. 31; P. Ex. 34, Paragraphs 1 of each the Complaint and Answer).

"All confidential material and other company property, including engineering notebooks and other invention records in your possession must be returned to the company. Engineering notebooks and other invention records are the property of the company whether the information contained therein is confidential or not and they must be returned for use as evidence in patent proceedings.

I have read, understand and agree to abide by the above."

28. In or about March, 1967, defendant Pentronix received from Sperry written notices that the individual defendants had signed the foregoing papers while in the employ of Sperry and thereby were under the contractual obligation set forth therein. The following letter is representative of the notices which were received by Pentronix regarding the key personnel formerly employed by Sperry:

"Mr. Robert W. Beyer has recently left the employ of the Univac Division of Sperry Rand Corporation. We understand that he has accepted employment with your Company.

"During his employment with us he had access to this Corporation's confidential information concerning memory cores. This is information which Mr. Beyer is under obligation not to disclose to others or use either during or after his employment.

Will you please take appropriate steps to assure that this information is not conveyed to or used by your organization." (P. Ex. 44A; P. Ex. 44B; P. Ex. 44C).

29. Sperry has confidential proprietary formulations (including the percentage of ingredients, used to produce the various core types) for its magnetic memory cores. A great deal of information about these formulations is set forth in a Memory Products Ferrite List which Beyer, while he was manager of Sperry's Magnetic Memory Core Group, had designated as "Company Confidential". In a letter to Sperry employees including Mulhollan, Beyer states that:

" * * * this information should not be distributed to any other personnel other than is necessary for the preparation of production batches. It also means that this copy may not be reproduced or transcribed." (N.T. pp. 192–193, 353; D. Ex. 22; P. Ex. 5).

30. Sperry has a confidential proprietary powder processing procedure which it developed for preparing the ingredients used in its magnetic memory cores. Detailed information on Sperry's procedure for powder processing is not taught to employees in its Magnetic Memory Core Group who are engaged in pressing or testing operations. (N.T. pp. 442–445, 561–563; P. Ex. 48, Reports 117, 121 and 123; P. Ex. 84A and 84B; Mulhollan Dep. pp. 79–80; Brinker Dep. pp. 188–189.)

31. Sperry has confidential proprietary tooling dimensions related to each of its magnetic memory cores. These dimensions, which are necessary for the pressing operation, are set forth on drawings designated as "Company Confidential" and signed by Beyer and Mulhollan. (N.T. pp. 518–519, 528–531, 563; P. Ex. 48, Report 118; P. Ex. 86A; P. Ex. 87A; P. Ex. 88A).

32. Sperry has confidential proprietary information on how to sinter or "fire" magnetic memory cores following the pressing operation. (N.T. pp. 255, 816–819).

33. Sperry has confidential proprietary information relating to the design of an automatic cancellation core tester. Such information is set forth on "Company Confidential" drawings, including individual circuit diagrams, parts lists and an overall wiring diagram signed by Brinker. N.T. p. 99; P. Ex. 43, p. 3; P. Ex. 76, P. Ex. 76A; P. Ex. 77; P. Ex. 78A; P. Ex. 78B; P. Ex. 97; P. Ex. 98).

34. Sperry has confidential information relating to all phases of the manufacturing and testing of magnetic memory cores, including quenching and sintering, much of which information has been acquired through empirical efforts and which information serves as a library of knowledge for enabling further advances in techniques for manufacturing and testing memory cores. (N.T. pp. 197–198, 804–806, 815; P. Ex. 48).

35. Sperry has confidential proprietary information relating to a voltage-time calibrator which is used in the calibration of instruments employed in test-

ing magnetic memory cores. (N.T. pp. 5–6, 8–76, 14–70, P. Ex. 80).

36. Sperry has confidential proprietary information relating to center-value cores which are used as reference cores for testing of production of magnetic memory cores. (N.T. pp. 1471–1472).

37. Beyer, in stating why he had Sperry's Memory Products Ferrite List stamped "Company Confidential", explained the meaning of this marking in the following manner:

"That this is something they shouldn't talk to competitors about or other people outside the company about, it is the business of the department.

\* \* \* \* \* \*

"Well, obviously I meant by that that I did not want any employees to go out and moonlight and give people our secrets and use it in some other facility they might be working in." (Beyer Dep. pp. 111–112).

38. Beyer understood that in his discussions with those outside Sperry he was not to disclose specific information concerning his work. (Beyer Dep. pp. 470–472; N.T. p. 1035).

39. Sperry screened visitors and escorted them when there was an occasion for a visitor's presence. (Beyer Dep. p. 453).

40. Brinker and Beyer practiced locking the door of the manager's office in Sperry's magnetic memory core plant because there was "Company Confiden-

tial" information therein. (Brinker Dep. p. 297; Mulhollan Dep. 156–157).

41. By sometime in April, 1967, within a period of less than three months after Pentronix first rented space for a plant in Frazer, Pennsylvania, and within about two months after hiring Brinker and Mulhollan, Pentronix was making some core types and contacting Sperry's customers with offers to sell a complete line of 16 different types of magnetic memory cores. (Beyer Dep. pp. 48, 59–60, 74–76, 94, 290 and 308; Mulhollan Dep. p. 106; P. Ex. 4; P. Ex. 4A; P. Ex. 28; N.T. p. 406).

42. Even before Pentronix had made a single core, it announced in printed data sheets not only the performance data for the complete line of 16 different types of magnetic memory cores but also the test characteristics for each of these different types of cores. (Beyer Dep. pp. 62–63; P. Ex. 4; P. Ex. 4A).

43. The Pentronix 3P40 core is one example of a magnetic memory core for which Pentronix announced the performance and test characteristics, before it made any magnetic memory cores. (P. Ex. 4; P. Ex. 4A). Not only are the performance characteristics of Pentronix' 3P40 core substantially identical with the Sperry 3045 core, but also their compositional make-ups are similar to each other. (N.T. p. 406: Beyer Dep. pp. 210–213, 308, D. Ex. 22; P. Ex. 90.) The following table compares the characteristics of the Sperry 3045 core and the Pentronix 3P40 core:

| CORE TYPE | If (ma) | IF (ma) | Tr (ns) | Td (ns) | $UV_1$ (mv) | $dV_z$ (mv) | tp (ns) | ts (ns) | O.D. (mils) |
|---|---|---|---|---|---|---|---|---|---|
| Univac 3045 | 520 | 315 | 100 | 600 | 44 | 8.5 | 210 | 410 | 30 |
| Pentronix 3P40 | 520 | 315 | 100 | 600 | 44 | 8 | 210 | 410 | 30 |

Beyer explained that the $dV_z$ figure of 8 millivolts for the Pentronix 3P40 core corresponds to a figure within the range of 6–10 millivolts. (Beyer Dep. pp. 290–291; P. Ex. 4; P. Ex. 4A; P. Ex. 6).

44. From the inception, the composition of the Pentronix 3P40 core has been substantially identical to that of the Sperry 3045 core. (P. Ex. 90).

45. The powder processing steps used by Pentronix at the time Pentronix set up its operation and the powder processing steps still used by Pentronix at the time of the trial, were not only identical to each other but were identical to the system taught to Beyer at Sperry by personnel who had participated in the development thereof before Beyer became connected with magnetic memory core work. (N.T. pp. 394–432; 698–737; P. Ex. 84A; P. Ex. 91).

46. While Pentronix uses standard presses for making its magnetic memory cores, custom tooling is requiring to be used with these presses. The importance of the correct tooling dimensions was described by Beyer. The tooling dimensions used by Pentronix are identical to those used by Sperry to the ten-thousandth of an inch. (N.T. pp. 504, 508–526, 1020–1029; P. Ex. 86A; P. Ex. 86B; P. Ex. 87A; P. Ex. 87B; P. Ex. 88A; P. Ex. 88B; P. Ex. 88C).

47. Pentronix proceeded to build and use an overall automatic cancellation core tester like Sperry's, and still does so. The differences between the two testers are inconsequential variations in specific positions of the readily shiftable modules in the five panels used by each company. (N.T. p. 102 & 103. Compare P. Ex. 76 with P. Ex. 95 and P. Ex. 95A). Sperry's drawings for its cancellation tester, as well as its drawings of the circuits for the driver, photocell and sense amplifiers, are marked "Company Confidential". Brinker's signature appears on Sperry's drawing of its cancellation tester. (P. Ex. 76; P. Ex. 77; P. Ex. 78A; P. Ex. 78B; P. Ex. 97; P. Ex. 98; Ex. D47).

48. Pentronix misappropriated the solenoid driver circuit which was designed at Sperry for use in the Sperry automatic tester, to be used identically and for exactly the same purpose in the Pentronix automatic core tester. Twenty-four such circuits are used at Pentronix. (N.T. pp. 103, 108–109. P. Ex. 75, P. Ex. 77).

49. Brinker, after having misappropriated the circuit design of a voltage-time calibrator (designed at Sperry for use in the calibration of test equipment employed to test magnetic memory cores) and after having twice sold such a voltage-time calibrator, through a third party, for his own monetary gain, further used the misappropriated design of said voltage-time calibrator for the benefit of defendant Pentronix by building such a voltage-time calibrator and selling it through said third party to defendant Pentronix to be used for the same purpose at Pentronix that it had been designed for at Sperry. (N.T. pp. 143–147, Levine Dep. pp. 1–63, P. Ex. 55–72).

50. Pentronix, after having tried the use of a resistor signal mixer with its automatic core tester, adopted a transformer signal mixer, in accordance with a design which Brinker conceived and built while he was employed at Sperry for use with Sperry's automatic core tester. N.T. pp. 1165–1168).

51. Mulhollan, in the two weeks after announcing his resignation from Sperry and before his departure, had secretarial personnel make him a Xerox copy of a compilation of 138 Sperry Progress and Technical Reports which totaled some 668 pages. These Progress and Technical Reports represent a library of information compiled by Sperry through many years of empirical effort and include, inter alia, detailed and confidential information on formulations on the powder processing procedure used by Sperry and the tooling specifications used at Sperry for the pressing operation. The Xerox copy of the reports which Mulhollan had secretarial personnel prepare, could not be found at Sperry. (Lingg Dep. pp. 10–15; Grieves Dep. pp. 3–9; Mulhollan Dep. pp. 129–131, 143–150, N.T. pp. 528–531, 561–563; Brinker Dep. pp. 272, P. Ex. 46–48).

52. Brinker, after he had announced his resignation from Sperry, had secretarial personnel make Xerox copies of two Sperry compilations of engineering bulletins which totaled some 420 pages and which documents included information relating to the specifications of Sperry's customers and competitors and which were compiled for use by Sperry in its magnetic memory effort. The Xerox copies of these bulletins cannot be found. (Lingg Dep. pp. 5–9; Grieves Dep. pp. 5–9; Brinker Dep. pp. 220–221, P. Ex. 46, 47, 49, 50, N.T. pp. 1562–1565, 1572.)

53. Brinker, during the month of January 1967, instructed a Sperry employee, Ivarson, to develop a set of center-value cores (cores suitable for use as reference cores). This set of reference cores was prepared, and thereafter disappeared from the cabinet in which they were kept. (N.T. pp. 1471–1472, 1479–1480, 1482–1485).

54. Beyer's initial proposal to Pentronix was based on information gathered while working at Sperry. (N.T. pp. 353–357; P. Ex. 43).

55. Defendants have adopted the overall concept for manufacturing magnetic memory cores that they learned at Sperry including: ordering equipment, virtually identical to the equipment that they used at Sperry; using compositional make-ups for their cores which are the same as Sperry uses in its cores and which they learned while they were at Sperry; using ferrite powder processing techniques which they learned at Sperry; using tooling dimensions in equipment to press their cores which they learned at Sperry; and using a cancellation testing technique and equipment which they learned and used at Sperry. (N.T. pp. 102, 103, 108–109, 115–137, 388–406, 473, 508–526, 1020–1029, 1183, 1296; Beyer's Dep. 210–213, 302, 359–387; D. Ex. 22, P. Ex. 73, P. Ex. 78A–78J, P. Ex. 88A–C, P. Ex. 89A–B, P. Ex. 90 and P. Ex. 91).

56. Following the termination of the individual defendants employment with Sperry, Sperry discovered that certain of plaintiff's documents bearing confidential information were missing from its magnetic memory core manufacturing facility. One of Sperry's four management procedure bulletins which describes Sperry's techniques for processing cores in detail is missing. (N.T. p. 1563).

57. A file which contained all the developmental effort on a 2018 core, (a file that had been very active prior to the departure of the defendants) is missing. (N.T. p. 1563).

58. Mrs. Grieves and Mrs. Lingg, secretarial personnel of Sperry, saw Brinker after he had announced his resignation repeatedly take an expanded briefcase from Sperry and return with the briefcase thin. Mrs. Lingg also saw Mulhollan carry cardboard cartons from Sperry after he had announced his resignation. (Grieves. Dep. pp. 8–9; Lingg Dep. pp. 14–16).

59. Defendants attempted to show extensive trial and error work in the development of their magnetic memory cores. However, the only documentation that was produced as proof consisted of seven pages of a notebook belonging to Beyer and part of a notebook belonging to Brinker. In addition, there was no evidence of any trial and error work to support their offering to the public of a complete line of sixteen different magnetic memory cores in less than three months after starting their business. (P. Ex. 4, P. Ex. 4A, P. Ex. 9 and P. Ex. 27).

60. Defendants attempted to show that it was not inconsistent to offer sixteen different magnetic memory cores in less than three months after going into business by the testimony of Hufnagel. However, Hufnagel, a man with ten years experience in the manufacture of magnetic memory cores at that time, took some seven months to make one single type core, which was interchangeable with the core he made at Sperry for Fabri-Tek. A year and seven months was required for Hufnagel to develop

a second core type. (N.T. pp. 2015–2017).

61. Defendants attempted to show as part of their alleged trial and error work some experimentation with different percentages of binder added to the ferrite material. However, it was developed that the percentage of binder initially employed by Beyer at Pentronix, before any such experimentation, was identical to the percentage which he had used at Sperry, and after such alleged experimentation Beyer once again continued to use exactly what he had used initially at Pentronix, i. e., exactly the same percentage of binder used at Sperry. (N.T. pp. 396, 733; P. Ex. 84A; P. Ex. 91).

62. Defendants attempted to show that the process of making magnetic memory cores is fully disclosed in the prior art. However, it was developed during Beyer's deposition that he was unable to explain how he used any of the publications he cited to set up Pentronix' magnetic memory core operation. (Beyer Dep. pp. 223–230, 427–428; P. Ex. 91).

63. The defendants attempted to show that companies engaged in making a magnetic memory core freely give away their processing information to outsiders who are being shown their facilities. However, it was developed that the tours are "classical" guided tours for sales purposes and that information related to the details of processing magnetic memory cores is not revealed. (N.T. pp. 576, 584, 586).

64. Defendants also attempted to show by implication that if the composition of magnetic memory cores could be obtained by analysis, then they could be manufactured. However, it was developed that Pentronix never had any cores analyzed. Moreover, it was developed that analysis of magnetic memory cores would not teach the process used to fabricate a core (Beyer's Dep. pp. 408, 521–522, 236).

65. The defendants attempted to show that the same tooling dimensions are used throughout the industry in order to mitigate the significance of the evidence that Pentronix was using the same tooling dimensions as Sperry. However, it was developed through defendants' own witness Zumwalt (EMI's Manager of Process Engineering) that the tooling dimensions of Electronic Memories, Inc. (EMI) were not the same as those used by Sperry and Pentronix. (N.T. pp. 504, 739, 740).

The importance of the correct size tooling unit for a core press was established through Beyer. Under examination by defendants' attorney, Beyer initially stated that the exact size of a core was not important. Beyer's subsequent testimony however established that the size of the core is important. The actual tooling figure set forth in the Report 118 of Sperry's Progress and Technical Reports (which were duplicated by Mulhollan) were identical to those used by Pentronix—down to the 10,000th of an inch. (P. Ex. 48; P. Ex. 86B; P. Ex. 87A–B; P. Ex. 88A–C; D. Ex. 76; D. 77; N.T. pp. 528–534).

66. Defendants attempted to show that Beyer had been an employee of Ferroxcube prior to his going into business at Pentronix and therefore by implication attempted to mitigate the significance of the evidence which showed that Beyer learned all that he knew about the development and manufacture of magnetic memory cores at Sperry. However, it was developed that Beyer was hired by Ferroxcube to establish and head a new department which did not involve magnetic memory cores and that within two to three *weeks* after leaving Sperry, and even before establishing the new department at Ferroxcube, Beyer contacted Pentronix with his proposal, "Proposal for the Set-Up of a Magnetic Memory Core Manufacturing Facility". (Beyer Dep. pp. 26–27; P. Ex. 43).

67. The defendants attempted to show that the automatic cancellation tester used by plaintiff and defendant was well known and could be purchased elsewhere. However, it was established

that an automatic cancellation core tester was not commercially available and that there had never been any detailed disclosure of Sperry's automatic cancellation tester. (D. Ex. 28, D. Ex. 41, D. Ex. 42, D. Ex. 43, D. Ex. 46 and P. Ex. 81A).

68. The defendants attempted to show that the chart and slides prepared by Sperry, for the purpose of sales promotion, disclosed Sperry's process of manufacture of magnetic memory cores. However, the slides were shown to the Court and revealed none of the *details* of the *process* of producing magnetic memory cores. The testimony related to the chart indicated that only four general steps in the powder process were even alluded to. (P. Ex. 104, N.T. pp. 2057–2062).

69. The defendants attempted to show that there was a major difference between the automatic cancellation core testers used at Sperry and those used at Pentronix insofar as the lay-out of the modules is concerned. However, it was developed that the locations or lay-out of the modules could be readily changed by simply pulling any of the modules from the power rack and inserting such modules into different positions. In addition, it was developed that the interconnections of the modules were not dependent upon the physical locations of the modules themselves. (N.T. pp. 1263–1289; P. Ex. 95, P. Ex. 95A, P. Ex. 96, P. Ex. 96A–F).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and of the parties.

2. The Employee Confidential Information Agreements which were signed by the individual defendants while at Sperry are not unreasonable agreements and are binding on the individual defendants.

3. The corporate defendant Pentronix conspired with the individual defendants to have the individual defendants use plaintiff's trade secrets for the benefit of all of the defendants.

4. The individual defendants breached their Employee Confidential Information Agreements with plaintiff by misappropriating and using the plaintiff's trade secrets for the production of magnetic memory cores for the benefit of all of the defendants.

5. The individual defendants breached their Employee Confidential Information Agreements with Sperry by establishing with Pentronix a competing corporation in such a manner as to damage the plaintiff's competitive advantage in the magnetic memory core field and seize that advantage for the benefit of all of the defendants.

6. The individual defendants violated the Common Law rights of plaintiff with respect to keeping in confidence the confidential information which was entrusted to them, by misappropriating and using the plaintiff's trade secrets for the production of magnetic memory cores for the benefit of all of the defendants and to the detriment of plaintiff.

7. The individual defendants violated the Common Law rights of the plaintiff with respect to keeping in confidence the confidential information with which they were entrusted, by establishing with Pentronix a competing corporation in such a manner as to damage the plaintiff's competitive advantage in the magnetic memory core field, and seized that advantage for the benefit of all of the defendants.

8. The defendants have no right, in view of the Employee Confidential Information Agreements with the plaintiff and in view of the plaintiff's Common Law rights with respect to the preservation of their trade secrets, to practice the Sperry process for making magnetic memory cores, including using Sperry's ferrite material formulations, powder processing techniques, tooling dimensions, sintering and quenching techniques and core testing techniques.

9. The misappropriation of the Sperry process for making magnetic memory cores by the defendants has

caused Sperry irreparable damage and harm.

10. Judgment may be entered, on the complaint and plaintiff's motion for permanent injunction, in favor of the plaintiff and against the defendants.

11. The plaintiff is entitled to an accounting and damages for profits lost through the wrongful activities of the defendants together with its costs.