**WILSON CERTIFIED FOODS, INC.,**
**Plaintiff,**

v.

**FAIRBURY FOOD PRODUCTS,**
**INC., et al., Defendants.**

**Civ. No. 72-0-123.**

United States District Court,
D. Nebraska.

Jan. 10, 1974.

Dressler, Goldsmith, Clement & Gordon, Ltd., Chicago, Ill., Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., for plaintiff.

Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, Omaha, Neb., for defendants.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This case came on for trial on October 23, 1973, on a complaint filed by Wilson Certified Foods, Inc. (the predecessor in interest of Wilson & Co., Inc.), a Delaware corporation against two Nebraska citizens and two Nebraska corporations. Jurisdiction of this Court is based on 28 U.S.C. § 1332; diversity of citizenship and the requisite amount in controversy are established. The complaint alleges unlawful appropriation of trade secrets by the defendants and asks for relief by means of an injunction and damages.

Wilson is a manufacturer of food products. During the 1960's, Wilson developed a process for manufacturing cooked bacon particles known as Bits-O-Bacon. The production of Bits-O-Bacon was carried out in Wilson's Omaha Plant, and defendant Arden Schacht was at all relevant times foreman of the department in which this work was done. In May of 1971, Mr. Schacht left Wilson's employ and became president of defendant Fairbury Foods, Inc. Subsequently, Fairbury began producing a cooked bacon particle similar to Wilson's. Wilson has instituted this suit against Mr. Schacht, Fairbury Foods,

Inc., Mr. Richard Westin (the current president of Fairbury), and Feaster Foods, Inc., a corporation which distributes Fairbury's bacon products. There is no claim that Mr. Schacht took from Wilson any written material. The assertion here is that by applying his knowledge of Wilson's process in his work at Fairbury, Schact unlawfully appropriated a Wilson trade secret.

There is no dispute over the fact that the law of Nebraska is controlling. This Court had the opportunity to pass on the Nebraska law with regard to trade secrets three years ago in the case of Cudahy Co. v. American Laboratories, Inc., 313 F.Supp. 1339 (D.Neb.1970). At that time, and as set forth in *Cudahy*, Judge Richard E. Robinson noted that the Supreme Court of the State of Nebraska had not passed directly on this particular area of the law and, therefore, followed the rule:

"(T)hat in the absence of instructive decisions or considered dicta by Nebraska Courts on the points in question, the Court may consider any other materials persuasively indicating the course of decisions within the state. Cooney v. Moomaw, 109 F. Supp. 448 (D.Neb.1953). It is also generally the rule that in the absence of state law a federal court should make use of all available data on the questions involved, including restatements and treatises and where appropriate may assume state law will follow the majority rule. Glassman Construction Company v. Fidelity & Casualty Co. of New York, 123 U.S.App. D.C. 1, 356 F.2d 340 (1966)." 313 F. Supp. at 1342.

We are cited to no Nebraska decisions rendered since *Cudahy* and therefore find that the conclusions of Judge Robinson in that case as to the Nebraska law are not only still applicable but are especially significant and appropriate so far as the instant case is concerned.

In *Cudahy*, the essential elements of a cause of action for a misappropriation of a trade secret were found to be:

1) The existence of a trade secret; *

2) Acquisition of the secret as a result of the confidential relationship;

3) Unauthorized use of the secret.

In setting forth these elements the Court expressly followed the law as set forth in E. W. Bliss Company v. Struthers-Dunn, Inc., 408 F.2d 1108 (8th Cir. 1969), and Sandlin v. Johnson, 141 F.2d 660 (8th Cir. 1944). As stated in *Bliss*, 408 F.2d, pages 1112–1113:

"Initially, we note that in Sandlin v. Johnson, 141 F.2d 660 (8th Cir. 1944), this Court recognized and approved the general rule that a trade secret consists of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. * * * The essential elements of a cause of action for appropriation of a trade secret are (1) existence of a trade secret, (2) acquisition of the secret as a result of a confidential relationship, and (3) unauthorized use of the secret. Venn v. Goedert, 319 F.2d 812, 815 (8th Cir. 1963); Sandlin v. Johnson, *supra,* Restatement, Torts, § 757. In general, the essence of the wrong is the obtaining of unjust enrichment and unfair competitive advantage through inequitable conduct. * * * This protection given to trade secrets is a shield, sanctioned by the courts, for the preservation of trust in confidential relationships; it is not a sword to be used by employers to retain employees by the threat of rendering them substantially unemployable in the field of their experience should they decide to resign. This shield is not a substitute for an agreement by the employee not to compete

---

* "The threshold issue in every case is not whether there was a confidential relationship or a breach of contract or some other kind of misappropriation, but whether, in fact, there was a trade secret to be misappropriated." 2 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies,* Sec. 51.1 at 348 (3d Ed. 1968).

with his employer after the termination of employment. Basically, an employer may not restrict an employee's future employment except by an agreement embodying reasonable terms. * * *

"In the present case, there is no agreement not to compete nor is there a contract for a specific term of employment. * * * Accordingly, Bartlett, Clark, Henry and Dinges were entitled to resign from Eagle's employ for a good reason, a bad reason, or no reason at all, and are entitled to pursue their chosen field of endeavor in direct competition with Eagle so long as there is no breach of a confidential relationship with Eagle. * * * "

Considerable evidence has been introduced during the trial of this case. on each of the elements, *supra*, namely, the existence of a trade secret, the acquisition of the secret as a result of a confidential relationship and the unauthorized use of the secret. Based upon all the evidence, this Court finds that the plaintiff has not proved that it possessed a trade secret capable of misappropriation. Because the decision of the Court turns on the non-existence of the first element listed above, discussion will be confined to that issue. The evidence introduced on the similarity of Fairbury's products to that of Wilson's and the circumstances of the defendant Schacht leaving Wilson need not be discussed.

*Cudahy* adopted a set of six factors set forth in Restatement, Torts, § 757, as the basis for determining the existence of a trade secret. This section of the Restatement is also cited in *Bliss*. These factors will serve as guidelines for this Court's findings of fact and conclusions of law and they are as follows:

I) The extent to which the process is known outside the plaintiff's business;

II) The extent to which the process is known by employees of the plaintiff and by other persons in the plaintiff's business;

III) The extent of the measures taken by the plaintiff to guard the secrecy of the process;

IV) The value of the information to the plaintiff and to its competitors;

V) The amount of effort or money expended by plaintiff to develop its process;

VI) The ease or difficulty with which the process could be properly acquired or duplicated.

## I.

### THE EXTENT TO WHICH THE PROCESS IS KNOWN OUTSIDE THE PLAINTIFF'S BUSINESS

The defendants' principal contention here is that the plaintiff's process is essentially a form of dry-rendering, a technique well known throughout the cooked food industry. The only expert witness called to testify in this trial stated that Wilson's process was indeed no more than dry-rendering. A number of excerpts from the literature on food processing are in evidence which discussed the dry-rendering process. Plaintiff argues that its system is not dry-rendering because the purposes of the two processes are different. The goal in dry-rendering is to remove useful fat from animal tissue with the residue, known as tankage, then used for animal feed. It is the fat which is primarily desired. On the other hand, in the plaintiff's Bits-O-Bacon process, the desired end product is not fat, but edible meat. Even though the goals or desired end products of these two processes may be different, it is apparent to the Court that the manner in which these results are reached is basically the same. In the plaintiff's process, the raw material is known as bacon ends and pieces, that is, the scraps remaining when bacon is sliced and prepared for the usual sale. The material is first ground and then cooked in a vacuum-equipped steam-jacketed Groen kettle. This kettle is equip-

ped with agitators which stir the material during cooking. After cooking, the material is dumped into perforated baskets in order to drain away the fat. It is then pressed to remove additional fat, and finally is packaged. For a strikingly similar generalized account of the dry-rendering process, see A. E. Bailey, Industrial Oil and Fat Products, (2d edition, 1951, at 552–53; 3d edition at 651–52).

The plaintiff disputes the relevance of the literature references provided by the defendants on the ground that they were found after production by Fairbury was commenced and, therefore, could not have been relied upon by Fairbury in developing its process. This is undoubtedly true. However, the importance of these references is that they indicate that the same basic process as is used by Wilson has been discussed in the literature for decades and is generally and widely known outside of Wilson's operations.

The basic similarity in the two processes might not be enough to weigh against Wilson on this first issue, however, if Wilson had shown modifications which particularized the system it used. Wilson's day-to-day guidelines for producing Bits-O-Bacon are known as the Plant Operating Instructions. These give more specific directions as to the size of the grinding plate (although a different size is indicated in an information sheet distributed to Wilson's sales brokers), the amount of pressure at which the material is cooked, the temperature at which the raw material is ground and cooked, and the amount of vacuum under which the cooking takes place. It is unnecessary to report the Wilson process in any greater detail because the testimony at trial indicated that the directions in the Plant Operating Instructions were not regularly followed and that the equipment operators had a considerable amount of discretion in determining when the material was ready to progress from one step of the process to another. There is evidence that the starting temperature of the raw material varied considerably and that the amount of vacuum pressure specified in the Plant Operating Instructions was an optimum level not always reached. In general, there are many factors such as starting temperatures and amount of raw material, amount of vacuum pressure, and time of cooking, which interrelate in the cooking and no fixed formula as to these factors was and is used by Wilson.

As to the equipment used in Wilson's process, there is no indication that any of the items are unique or that Wilson's adaptations of them to its bacon-cooking process is novel.

Therefore, because the basic process used by Wilson is dry-rendering and because no significant adaptations of that process have been made by Wilson, this Court finds that the process used by Wilson is one of general knowledge outside Wilson's business.

II.

THE EXTENT TO WHICH THE PROCESS IS KNOWN BY EMPLOYEES OF THE PLAINTIFF AND BY OTHER PERSONS IN THE PLAINTIFF'S BUSINESS.

Research on a cooked bacon particle product was begun at Wilson in late 1961 by Messrs. Kohout, Edgar and Johnson. Mr. Schacht was then foreman of the BV Dehydration Department in which gravies and dehydrated meat products were manufactured. When the initial research on the Bits-O-Bacon was completed, experimental fifty pound loads were produced on the second floor of Wilson's Omaha Plant, under the direction of a Mr. Dufek. The testimony is in conflict as to when production came under the direction of the defendant Schacht. It is clear that at least by the time the 1,000 pound loads were being produced on the sixth floor of the Omaha Plant, Mr. Schacht was in charge of production. It is undisputed that Mr. Schacht was thoroughly familiar with the process of manufacturing (although not with the research and analysis lead-

ing to production) of Wilson's Bits-O-Bacon.

It is unclear exactly how many of Wilson's employees were familiar with the Bits-O-Bacon process from the time of its development until Mr. Schacht's departure in May, 1971. Mr. Schacht was at one time in charge of as many as seventy people on both the second and sixth floors, although not all of these were working on Bits-O-Bacon. By May of 1971, there were at least eight to ten full-time equipment operators for the Bits-O-Bacon process. But the individuals engaged in the process varied on a given day because work in Wilson's plant was allocated on the basis of seniority, and employees with greater seniority had first choice as to the particular jobs they wished to perform. There is no evidence that there was any special training required for or skill involved in becoming an operator. Nor did Wilson make significant efforts to restrict knowledge of the Bits-O-Bacon process to any certain employees within the Wilson operation.

These factors weigh heavily in the Court's finding and concluding that the Bits-O-Bacon process was relatively well-known within the Wilson operation.

## III.

### THE EXTENT OF THE MEASURES TAKEN BY THE PLAINTIFF TO GUARD THE SECRECY OF THE PROCESS.

All of the actions which are relevant to this lawsuit took place at Wilson's Omaha Plant. This plant has a general security system whereby all persons desiring entry to the plant are questioned by a guard concerning their identification and purpose for visiting. Visitors are then issued passes and are accompanied by a Wilson employee at all times while within the plant. Bits-O-Bacon is produced solely on the sixth floor. There is only one entrance to this floor and all persons entering must pass in front of the foreman's office from which they can be seen through a glass window. The Court finds, however, that these measures constitute nothing more than general plant security of a type which is often present in manufacturing operations.

Mr. Schacht signed two agreements wherein he promised not to disclose any confidential information belonging to Wilson. The first of these is a part of the general employment form which all persons applying for work at Wilson must sign. The second is an agreement executed by all Wilson supervisory and managerial personnel. The Court does not find these two agreements to be significant or controlling in this case. Neither agreement mentions the Bits-O-Bacon process in any respect and it is undisputed that forms of this type were signed by untold numbers of Wilson employees over the years, most of whom were never involved in the Bits-O-Bacon operation. Moreover, Mr. Schacht would not be legally permitted to disclose any valid trade secrets of Wilson even in the absence of these agreements, so their presence cannot aid Wilson in proving that a trade secret did exist.

There are a number of other facts which the Court finds are relevant in determining the extent of the secrecy Wilson maintained concerning its Bits-O-Bacon process:

1) A copy of the Plant Operating Instructions for the Bits-O-Bacon operation was kept unlocked in Mr. Schacht's desk, and access to Mr. Schacht's office was not restricted.

2) A Bits-O-Bacon information sheet, which gave a general description of the manufacturing process, was distributed to Wilson's sales brokers.

3) Signs on the sixth floor restricting access to the Bits-O-Bacon production area were maintained with great irregularity.

4) The operators of the Bits-O-Bacon process were not cautioned that the process was confidential.

5) Approximately ten to twelve tours of college students were conducted through the Bits-O-Bacon production

area each year and viewed the entire procedure.

While each of these elements, individually, may not indicate a lack of secrecy by Wilson, the total combines to lead this Court to conclude that Wilson clearly has not made significant efforts to guard and maintain the secrecy of its Bits-O-Bacon process. See Peerless Roll Leaf Co., Inc. v. Lange, 20 F.2d 801 (3d Cir. 1927); J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 260 N.E.2d 723.

## IV.

### THE VALUE OF THE INFORMATION TO THE PLAINTIFF AND TO ITS COMPETITORS.

There has been a paucity of evidence introduced on this issue, and the Court recognizes the difficulty of proof in this area. The evidence does show that Fairbury Foods has made a substantial profit from its cooked bacon particles operation and the Court infers that it has also been a profitable venture for Wilson. There is also evidence that four or five other well-known companies are producing cooked bacon particles. Some of these products have been introduced in evidence, and based upon the testimony and the Court's own observation, the Court finds that there is no substantial difference between the various products. In short, there is no evidence to indicate that the process used by Wilson gives it an advantage of any kind over the other producers and the Court concludes that the value of the particular process used by Wilson is not significant.

## V.

### THE AMOUNT OF EFFORT OR MONEY EXPENDED BY THE PLAINTIFF TO DEVELOP ITS PROCESS.

The best evidence on this issue would have been the research and development records kept by Wilson while the Bits-O-Bacon process was being worked on and formulated. Unfortunately, however, these records and any copies thereof, were lost and mislaid. One of the originators of the Wilson process, Mr. James J. Kohout, testified that according to his recollection, it took the equivalent of two full men a period of approximately one to one and a half years to develop the process which, when broken down, amounted to approximately 4,000 man hours spent on development and 1,000 man hours spent on testing. This testimony is sharply controverted by witnesses produced by the defendants as to the length of time and expense necessary to formulate such a process, the same being discussed at further length hereinafter. There was also some evidence that Wilson spent some time and effort in getting government label approval for its product. However, the proof introduced by Wilson on this particular issue was not strong or convincing and in the absence of the best evidence, must weigh against the plaintiff.

## VI.

### THE EASE OR DIFFICULTY WITH WHICH THE PROCESS COULD BE PROPERLY ACQUIRED OR DUPLICATED.

All the testimony relevant to this issue was offered by the defendants. Doctor Walter Urbain, the only expert to testify, stated that he felt he could duplicate the Wilson process, with or without the help of the information sheet Wilson gave its brokers, in less than a week.

Mr. William B. Phalen, a chemist and former employee of Cudahy Packing Co., testified that in 1962, he developed a satisfactory cooked bacon particle product after eight to ten hours of work at Cudahy. Although the amount of material produced by Mr. Phalen was considerably less than is produced by Wilson, the basic process is the same. Considering the testimony of Doctor Urbain and Mr. Phalen, and also the literature which is available on dry-rendering, the Court concludes that duplicating the Wilson process would not be a difficult problem for any person familiar with meat processing in general.

## CONCLUSION

One last important consideration which does not fall within the six points discussed above is the contribution of the defendant Schacht to the Wilson process upon which the plaintiff strongly relies to establish a case of wrongful acquisition of a trade secret. While Mr. Schacht took no part in the research and development of the Bits-O-Bacon theory, he conducted the first large-scale production. He was the foreman of the department in which Bits-O-Bacon was produced at all times from that first large-scale production until his departure in 1971. He made several suggestions for improving the process, including ideas relating to more efficient use of canning and labelling equipment, methods of loading raw material into the kettles, and the use of a press to remove excess fat, all of which were incorporated into the Bits-O-Bacon process. He also drafted the rough copy of the Plant Operating Instructions.

This is precisely the kind of experience which Judge Robinson found did not constitute a trade secret but which was more properly the subject matter of a covenant not to compete. In *Cudahy*, 313 F.Supp. at page 1345, the Court stated:

> "It is uncontradicted that Mr. Phalen contributed substantially to the materials contained in these instructions. He was also the man in charge of the plant. He was responsible for much of the process. To deny him the right to practice his trade by attempting to establish the general experience and knowledge of the employer as a trade secret when actually the employees' knowledge and experience in his trade is a substantial contribution to this general process is not the type of situation within the contemplation of the law guarding the disclosure of trade secrets. Any knowledge and experience of this nature desired to be protected is more properly the subject matter of a covenant not to compete. There is none present in this case."

*See also* Metal Lubricants Co. v. Engineered Lubricants Co., 411 F.2d 426 (8th Cir. 1969), where the Court stated, at page 429:

> " * * * As noted by the Missouri Supreme Court, we are dealing with two conflicting public policies. One policy seeks to protect a business from unfair competition. The other policy favors free competition in the economic sphere. The court explained:
>
> > ' "It is necessary that there be a balancing of the equities between these two rights, for if the former is carried to its extreme it will deprive a man of his right to earn a living; while conversely, the latter right if unchecked, would probably make a mockery of the fiduciary concept, with its concomitants of loyalty and fair play." Comment, the Obligation of a High-Level Employee to his Former Employer; The Standard Brands Case, 29 University of Chicago Law Review 339, 351–352. See Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430. In that case the court stated (160 A.2d 435): "Were we to measure the sentiment of the law by both English and American decisions in order to determine whether it favors protecting a businessman from certain forms of competition or protecting an individual in his unrestricted pursuit of a livelihood, the balance would heavily favor the latter." ' "

National Rejectors, Inc. v. Trieman, 409 S.W.2d 1 (Mo.1966).

With this last consideration in mind, and giving due weight to each of the factors considered above, the Court concludes that Wilson has not met its burden in proving that the Bits-O-Bacon process is a trade secret. Accordingly, by separate order filed this date, plaintiff's complaint is dismissed and judgment is entered for the defendants.