PRESSURE SCIENCE,
INCORPORATED,
Plaintiff,

v.

David KRAMER and the Advanced
Products Company, Defendants.

Civ. No. 15932.

United States District Court,
D. Connecticut.

April 15, 1976.

Peter A. Kelly, Tyler, Cooper, Grant, Bowerman & Keefe, New Haven, Conn., for plaintiff.

Shaun S. Sullivan, Wiggin & Dana, New Haven, Conn., for defendant Advanced Products Co.

Carter LaPrade, New Haven, Conn., for defendant David Kramer.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

In this diversity action grounded primarily on a claim of misappropriation of trade secrets, the plaintiff, Pressure Science, Incorporated ("Pressure Science") seeks injunctive relief and damages against David Kramer, a former employee of Pressure Science, and Kramer's present employer, The Advanced Products Company ("Advanced Products").

The complaint contains three counts: two set forth causes of action for unfair competition against Kramer and Advanced Products and the third is based on a theory of unjust enrichment against Kramer alone. The defendants deny the material allegations of the complaint; and, in addition, Advanced Products seeks affirmative relief by way of two counterclaims: the first alleges violations of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. § 1 *et seq.,* and the second contends that the suit was instituted with the malicious intent of deterring Advanced Products from competing in business with Pressure Science.

In pretrial proceedings, the issues concerning damages, unjust enrichment, and the Sherman Act were severed pursuant to Rule 42(b), F.R.Civ.P. Accordingly, the questions at trial were limited to Pressure Science's unfair competition contentions and Advanced Products' cause of action for vexatious suit. After a careful review of the testimony and exhibits submitted at the trial, which extended over a month, and the

comprehensive trial and post-trial briefs, the Court is of the opinion that the plaintiff failed to sustain its burden of proof on its claims of unfair competition and the defendant Advanced Products failed to sustain its burden of proof on its cause of action for malicious prosecution.

## I. FINDINGS OF FACT

### A. *THE PARTIES*

1. The plaintiff, Pressure Science, is a Maryland corporation, with its principal place of business in Beltsville, Maryland.

2. The defendant, David Kramer, is a citizen of Connecticut.

3. The defendant, Advanced Products, is a corporation organized under the laws of the State of Connecticut, with its principal place of business in North Haven, Connecticut.

4. For almost 20 years, Pressure Science and its president, Dudley Taylor, have been engaged in the development, use and manufacture of metal seals, with particular emphasis on the manufacture of the metal seal which has a "C" configuration.

5. Taylor is a talented licensed professional engineer who devoted the major part of his business career to the development and manufacture of the C-seal. His modern machine shop employs 90 people, and his company has been regarded as the leading source of the manufacture and distribution of the C-seal.

6. Kramer, who held himself out as possessing high academic credentials, including a degree from the Massachusetts Institute of Technology and a master's degree in metallurgy from Columbia University, was hired by Pressure Science in November 1971.

7. Kramer became the production manager at Pressure Science at a salary of $25,000. During his employment, Kramer was involved in every aspect of the plaintiff's business on a daily basis and became familiar with the entire process by which Pressure Science manufactured C-seals.

8. On May 26, 1973, Kramer was released from his employment because Pressure Science was dissatisfied with his work and, in addition, the company learned he had misrepresented his background and academic credentials.

9. At no time during his employment at Pressure Science did Kramer execute a nondisclosure agreement concerning the company's manufacturing process.

10. Advanced Products was formed in 1954. Its chief executive officers are Harvey R. Sommer and Arthur Hostage. Sommer, a graduate of MIT, is an intelligent, progressive engineer who, along with Hostage, concentrated their company's efforts on the manufacture of metal seals or rings which have a configuration of an "O". Soon Advanced Products became one of the largest manufacturers of metal -O- rings in the world. It employs 60 persons and has gross sales of approximately one and one-half million dollars. It has an established reputation for competence as a metal seal manufacturer.

11. Following two interviews by officials of Advanced Products, Kramer was hired by Advanced Products as an engineer with a salary of $22,000 on June 1, 1973. He became the company's project engineer and was placed in charge of the manufacture of metal -C- rings.

12. In this lawsuit, Pressure Science alleges that, as a result of Advanced Products' employment of Kramer, Advanced Products unlawfully appropriated confidential information and trade secrets of Pressure Science, including those relating to Pressure Science's manufacture of the metal -C- ring or C-seal.

### B. *THE METAL SEAL BUSINESS*

13. A metal seal is normally installed in the recess between two flanges in a piece of equipment in order to provide a leak-proof seal at the flange joint.

14. The use of metal seals has increased over the years with the development of machinery which requires sealing under environmental conditions exceeding the capabilities of organic seals. For example, rub-

ber or other non-metallic materials often cannot withstand extreme temperatures, violent pressures, radioactivity and corrosion. Thus, metal seals are in great demand in the construction of aircraft, missiles and nuclear reactor vessels.

15. Metal seals are manufactured in a variety of configurations including an "O" shape, a "C" shape, an "E" shape and a "V" shape.

16. The O-seal was in popular demand in the 1960's. The process for the design and manufacture of the O-ring was widely known in the trade and both Pressure Science and Advanced Products, among other companies, had exact knowledge of its production, use and manufacture.

17. The manufacture of an O-seal consists of multiple steps, none of which is claimed to be proprietary or secret by the parties. In general, the process consists of: a) coiling a piece of tubing of a common alloy into a circle on an arbor or a mandril whose size is approximately that of the finished product; b) placing the coil on a precise arbor for cutting; c) slicing the coil on a cut-off machine; d) welding the coil with a resistance butt welder after careful alignment; e) removing the weld upset which is the raised metal appearing around the diameter after welding; f) heat treating the ring; g) polishing, sand blasting or buffing if the ring is discolored by the heating procedure due to oxidation; h) again sizing the ring by the use of rollers; i) electroplating with silver, nickel, copper or other material according to specification; and j) packaging the ring in a plastic or urethane bag.

18. During the 1960's there was a selective but lucrative market for the seal with the "C" configuration. Several companies preferred the C-seal in the construction of aircraft engines and compressors and in low vacuum and radiation environments. Upon special request, Advanced Products produced the C-seal by machining away or cutting out a portion of the O-seal until the desired "C" configuration was achieved. However, this process was quite expensive and time consuming and constituted only a small part of Advanced Products' sales. The C-seal manufactured by Pressure Science was less costly to the customer and, as a result, Pressure Science controlled most of the C-seal business in the United States.

19. Pressure Science was able to produce a C-seal at a competitive price due to Taylor's research and experimentation. In 1956, Taylor originated the C-seal by machining it from an O-seal. The machining process was expensive, difficult, and required highly skilled employees. He conceived the idea that a C-seal could be "formed" rather than machined. His first attempts at "forming" a C-seal by the use of a die were not successful. In the next several years, he tried to form a marketable C-seal by rubber press forming and a technique referred to as "curling". But these methods still proved expensive and other means to manufacture the C-seal were sought. In 1961, Taylor designed a four-piece die to form the C-seal; and, Taylor received his first large order for the seal to be used in a Navy modular hydraulics program. The four-piece die had several disadvantages including sharp edges, sensitivity to slug dimensions, variances from slug to slug, and high costs.

20. Finally, in 1965, Taylor developed a two-piece die to form the C-seal which is currently being used, with some modifications, by Pressure Science in its C-seal manufacturing process.

21. Pressure Science contends that its process for the manufacture of formed C-seals is a trade secret. The steps in the process claimed to be proprietary are essentially as follows:

a) Method of preparing the slugs or hoops to be formed into the "C" shape. One way to produce the hoop is to slit a metal strip and weld it; another is to purchase tubing from a tube redrawing mill which has suitable diameters and wall thickness. Inconel strip is the primary substance used for the hoops. Pressure Science's primary source for Inconel strip is the Pfizer Metal Company.

b) Method of welding the strip. Pressure Science utilizes tungsten inert gas, or TIG

welding, in producing its C-seals. In welding the slug, it uses a welding fixture with shaped individual spring-loaded "fingers". After welding, the weld tabs are chiseled off the slug.

c) Method of weld mashing. "Mashing" the weld is the removal of projections in the vicinity of the tabs by a belt sander. Pressure Science employs shaped, as opposed to flat, tool bits to perform this operation.

d) Method of preforming the slug by roll forming. Pressure Science uses a male and a female roller device to slightly roll the hoops in order to produce a better "C" shape and to exert less wear on the forming tools.

e) Method of obtaining the final "C" shape. Approximately 95% of Pressure Science's C-seals are formed by a two-piece die; the remaining 5% are shaped by rollers. The two-piece die consists of a matching top and bottom half with half the "C" cut into the cavity of each piece. The two halves are aligned by a center pin. The die contains die stops and the inner surface of the slug is unsupported during the forming process. The dies are designed in Pressure Science's plant and are made of a tool steel known as Graph-air. Each die costs about $60. Pressure Science has the capability to die-form seals up to 20″ diameter; for larger seals, the forming is by use of rollers. However, roll forming is a well-known technique and is fully disclosed in the relevant literature.

f) Method for "pulsing" the C-seal for sizing and relieving residual stresses in the metal.

g) Method of heat treating the C-seal to enhance the seal properties.

h) Method of polishing the C-seal by the use of polishing pots. The purpose of polishing is to improve the surface finish and to give the seal a circular lay.

i) Method of electroplating the C-seal. In some applications, plating racks are used while the C-seals are electroplated with indium, silver or some other soft metal to seal leakage paths. Pressure Science's racks have spring clips that fit inside the "C" cross section and hold the seal in place during plating.

j) Method of packaging the C-seals.

22. Pressure Science's C-seal production procedures have never been patented.

23. Tours of the Pressure Science plant were conducted by supervisory personnel while the plant was in operation and the production processes were open to view. However, as a general rule, visitors could not obtain a detailed view of the procedures employed by Pressure Science to make C-seals.

24. Drawing of flanges and couplings containing dimensions sent by Pressure Science to its customers were imprinted with a legend indicating that the information was proprietary to Pressure Science.

25. Drawings of C-seals sent by Pressure Science to its customers did not contain a proprietary legend.

26. While Pressure Science's advertisements for flanges, seals, and couplings stated that they were made to "proprietary company designs," the advertisements for C-seals only refer to them as being made by "Taylor's exclusive economical process" and having "Taylor's exclusive curved seal line." The design of the C-seal is not claimed to be proprietary.

27. In 1970, Pressure Science drafted an employee contract which related to the non-disclosure of the company's patents, inventions, proprietary information and related matters.

28. The employee agreement was executed by Taylor and other Pressure Science officials but not by Kramer.

29. Pressure Science had no routine procedure for informing employees of any proprietary processes until 1974.

30. Robert N. Russell, Jr., a credible witness, was a former employee of Pressure Science who left the company in 1973 on amicable terms to resume his education at the University of Maryland. He testified that he worked as a production expeditor and had daily contact with all the steps used in the manufacture of C-seals. He

understood the basic elements of the C-seal production process and knew the identity of all of the company's supplies.

At no time was Russell required to sign a nondisclosure agreement or advised that the C-seal manufacturing techniques were confidential and should not be disclosed. Moreover, he was not aware that any officials of Pressure Science had informed the company's employees that the production of C-seals was to be regarded as proprietary to the company.

31. In 1972, it became evident to Advanced Products that the demand for C-seals was increasing and that its O-ring business was being seriously eroded because large companies, such as Pratt & Whitney, were purchasing C-seals from Pressure Science rather than O-rings from Advanced Products. Sommer further recognized that his company could not profitably manufacture C-rings from finished O-rings on a large volume basis because of the high cost of tubing and other expenses associated with the production of O-rings.

32. By early 1973, Advanced Products' officials and engineers were actively engaged in discussions concerning various methods of producing C-seals by means other than machining them from O-rings. The discussions included rubber press forming, die forming and roll forming. Bernard Sniegowski, Advanced Products' project engineer and quality control manager, was assigned the task of recommending practical and inexpensive methods to manufacture C-seals. Sniegowski was a capable mechanical engineer with long experience in the metal seals and rings field. Among other things, he was quite familiar with metal forming practices.

33. On May 15, 1973, Sniegowski submitted a memorandum to Sommer entitled "General Comments on 'C' Seal Forming Methods." The memorandum discusses various methods and mentions "straight matched metal die forming," "rubber press forming," "mechanical compression between flats," and "a metal die set split but ½ C top and bottom." Sniegowski further stated that he had prepared "a completed plan to start with rubber press forming."

34. Sommer took no action on the Sniegowski memo and relieved Sniegowski of primary responsibility for the company's new ventures into the C-seal business for three basic reasons: a) Sniegowski was heavily committed to other duties in the plant; b) Sommer was disenchanted with Sniegowski's preference for rubber press forming; and c) Kramer had come on the scene seeking employment with Advanced Products.

35. Although there had been over 100% turnover in Pressure Science's employees during the period 1970–1973, Advanced Products made no overtures to former employees of Pressure Science to join the staff at Advanced Products.

36. Kramer first contacted Sommer around the middle of May 1973, identifying himself as the production manager for Pressure Science and indicating that he was interested in new employment. Kramer was invited to visit Advanced Products for a job interview on May 22.

37. At the May 22 interview Kramer generally discussed his responsibilities and duties at Pressure Science. He explained that he had personality conflicts with certain of the officials at Pressure Science and that the company would not permit him to pursue certain suggestions he had made to management. He further indicated his salary was $26,000.

38. Obviously Kramer's availability for employment was extremely attractive to Advanced Products because of his experience in the manufacture of C-seals and the likelihood that he would be able to supervise the production of the seals either at Advanced Products' plant in Connecticut or at a new location acquired for that purpose.

39. Despite this, Kramer was not offered employment nor was anything said to induce Kramer to leave his job at Pressure Science.

40. Shortly after the May 22 interview, Kramer telephoned Sommer and expressed again his interest in being hired by Ad-

vanced Products. Another interview was arranged for June 1. At this time, Sommer was not aware that Kramer was unemployed.

41. Following the June 1 interview, Advanced Products made an offer of employment to Kramer at a salary of $22,000 and Kramer accepted. In 1973, Kramer received the lowest annual bonus paid to employees at Advanced Products ($200) and in 1974, he received no annual bonus.

42. Kramer reported to work on June 18, 1973. In the fall of 1973 Advanced Products began to manufacture formed C-rings. Sales for 1973 were $3,300; $33,000 in 1974 and approximately $66,000 in 1975.

43. Advanced Products utilizes most of the same general overall concepts in manufacturing its C-rings as Pressure Science does in producing its C-seals. However, almost every step in the production of C-seals was known or used in the manufacture of other and similar products; in addition, there are certain significant differences between the procedures employed by the two companies.

44. This Court, accompanied by counsel and their clients, personally inspected the Advanced Products' plant while it was in operation.

45. Advanced Products uses Inconel for its slugs and bands, as does Pressure Science. The properties of Inconel are well known in the metal seal business and Advanced Products in the late 1960's made large diameter O-rings from Inconel 718. A major supplier of Inconel, Pfizer Metals Company, is located in the same industrial park as Advanced Products and Sommer and others at Advanced Products were familiar with Pfizer's product line.

46. The art of TIG welding is common knowledge in the metal trade. Advanced Products, for many years, TIG welded its large O-rings with a welder designed and built by Sommer in 1962. In welding the C-seal slug, Advanced Products uses a solid bar hold-down fixture while Pressure Science employs shaped individual spring-loaded fingers. In welding, the necessity for a hold-down fixture is obvious and the fixtures used by Advanced Products and Pressure Science are distinctly different. The Advanced Products' fixture has a fixed mandril and two solid bars to clamp the strip and tabs during welding. The two bars are composed of separate segments to permit replacement of single components as opposed to an entire bar when uneven wear occurs. The segments are straight and not shaped. A bolt passes through the separate segments of each hold-down bar. The segments do not move independently of each other. The solid hold-down fixture is widely used in the industry as are separate starting and stopping tabs to avoid end craters.

47. Advanced Products does not use a welding fixture featuring shaped spring-loaded fingers in any way similar to Pressure Science's. In any event, the design features of Pressure Science's fixture are found in the advertising literature of welding fixture manufacturers and are available in fixtures which can be used to weld strip similar in size to that welded by Pressure Science and Advanced Products.

48. To remove the projections in the vicinity of the tabs, Advanced Products applies a metal working technique known as "planishing". Weld planishing is disclosed in the industry's literature and is used widely throughout the metal working industry. After the weld upset is planished, a belt sander, built by Advanced Products ten years ago, is applied to the edges of the weld zone to ensure their smoothness.

49. Advanced Products very seldom preforms the slugs or hoops prior to entry into the die; Pressure Science almost always preforms the hoop. In any event, the concept of preforming and its advantages were recognized by Sommer and Sniegowski prior to May 1973, and preforming was mentioned and depicted in the Sniegowski memorandum submitted on May 15, 1973, to Sommer. In the few instances that Advanced Products does preform, it utilizes standard rolling techniques on a milling machine purchased 15 years ago.

**624**

50. Advanced Products uses a split metal die, as does Pressure Science, to form its small to medium sized C-rings. The metal die is aligned with a single center dowel pin and half the "C" shape is cut into the top half of the die and half the "C" shape is cut into the bottom half of the die.

51. Prior to May 15, 1973, Sommer and Sniegowski were well aware of the concept that a split metal die could be used to form small to medium diameter internal and external C-rings.

52. Prior to May 15, 1973, Sommer concluded that the preferred way to produce small to medium diameter internal and external C-rings was to use a split metal die with half the "C" shape in the top and half the "C" shape in the bottom.

53. Prior to May 15, 1976, Sniegowski possessed the knowledge and experience to implement the manufacture of C-rings by utilizing a split die.

54. Without Kramer's guidance and advice, Advanced Products could have produced formed C-rings on a production basis within nine months after May 15, 1973.

55. The two expert witnesses, Edward A. Barton and George Merwin, called by Advanced Products to testify at the trial, are both highly skilled specialists in the tool and die business. The Court gives full credence to the testimony of these well-qualified, impartial witnesses.

56. Barton is president of the J. C. Barton Company, the largest tool and die company in Connecticut. The company specializes in the design and manufacture of special tools and dies and, over the years, it has designed and made dies ranging from simple two-piece dies for $150 to $200 to expensive progressive dies for $25,000. Barton has been actively engaged in the tool and die business for over thirty-five years and is a specialist in die design work.

Merwin is the founder and former president of Aladdin Tool & Die Company ("Aladdin"), a large tool and die company in Connecticut that specializes in precision tool and die work. Most of Aladdin's work involves the design and manufacture of dies to form small parts where the tolerances are one-thousandths of an inch. Merwin headed Aladdin for over 25 years and, during that time, he was actively engaged in die design.

57. Both independent experts explained that the die-forming techniques used by Pressure Science and Advanced Products are well known and commonly used techniques in the tool and die industry. Both men had extensive prior experiences with split dies, with unsupported forming, and the use of stops to control the flow of metal in a die cavity.

58. While Barton and Merwin never made a die to form a C-seal, each of their respective companies, upon request, could have designed and made such a die within a matter of a few months. They would have used an air-hardened tool steel and the die would have been split because there has to be a way to separate the die and remove the part. Since the part to be formed was round, the die would have been round; and, it would have been aligned by a single center pin, since that is the simplest way to align two concentric halves. Further, in order to form the hoop into the desired C shape, the interior cavity of the die obviously would have had a C cross-sectional shape cut into it. Lastly, the shape of the finished part (a ring with a "C" shaped opening) would have made it apparent that there had to be a stop in the die cavity in order to maintain the desired cross-sectional opening.

59. Barton testified that he would have given a $1500 to $2000 quotation on the first die and considerably lower quotations on subsequent dies. Barton thought he could eventually make metal-C-ring dies for $100. Merwin testified that he would have given $1000 to $1200 quotation on the first die and that he could eventually sell the dies for $200 to $300, and possibly lower.

60. There is nothing novel, secret or unique about the split metal die employed by Pressure Science and Advanced Products to form internal and external metal C-seals.

61. Advanced Products does not "pulse" its C-rings in order to relieve residual stress.

62. In sizing the free height of a C-ring, Advanced Products confines the ring between a retainer plate and top plate and then strikes the ring in a press once or twice. Advanced Products has been using this same technique to size its O-rings for over 16 years.

63. Advanced Products heat treat its C-rings in the same manner it heat treated its O-rings and machined C-rings for many years prior to May 1973.

64. There is nothing unique or novel about Pressure Science's or Advanced Products' use of polishing pots. Almost identical devices were being used by other metal seal manufacturers prior to May 1973. For example, in 1968, expanding aluminum chucks or pots were used by D.S.D. Magnatech in the production of the Servo-Flex seal.

65. Advanced Products' method of electroplating the C-ring, when necessary, involves the use of plating racks which are commercially available and, prior to May 1973, widely used throughout the industry.

66. Advanced Products uses the same material to package C-rings that it used for at least five years to package its O-rings.

67. Kramer's knowledge of and experience in the C-seal business proved beneficial to Advanced Products; his employment enabled the company to gain a "lead time" of several months in penetrating the C-seal business on a production basis. However, Kramer did not reveal or utilize any trade secrets belonging to Pressure Science during the course of his employment with Advanced Products.

68. None of the materials, sources of materials, devices, concepts, or methods used by Pressure Science in the manufacture of C-seals was a trade secret.

69. The totality of all the materials, sources of materials, devices, concepts, or procedures in the ten principal steps used by Pressure Science in the production of C-seals was known by others or used by others in the metal trade business and tie and die industry, and was not, therefore, a trade secret of Pressure Science.

70. There is no credible evidence in the record that Pressure Science instituted the present action with an improper motive or for the purpose of keeping Advanced Products out of the C-ring business.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and of the parties; the amount in controversy exceeds $10,000, exclusive of interest and costs. 28 U.S.C. § 1332.

2. Pressure Science's process for the manufacture of formed metallic C-seals is not a trade secret.

3. Kramer was free to use his knowledge of and experience in the manufacture of C-seals during his employment with Advanced Products.

4. Advanced Products did not misappropriate or use for its own purposes any of Pressure Science's trade secrets for the production of C-seals.

5. Judgment may enter on the complaint in favor of the defendants and against the plaintiff.

6. Judgment may enter on the counterclaim in favor of the plaintiff and against the defendant Advanced Products.

## III. DISCUSSION

There is no dispute that in this diversity action the law of Connecticut applies and governs the substantive issues. *Franke v. Wiltschek*, 209 F.2d 493, 494 (2 Cir. 1953); *Sperry Rand Corporation v. Rothlein*, 241 F.Supp. 549, 559 (D.Conn.1964).

The threshold issue in this case is whether a trade secret exists which is to be protected. *Plastic & Metal Fabricators, Inc. v. Roy*, 163 Conn. 257, 267, 303 A.2d 725 (1972); see also 2 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies*, § 51.1 at 348 (1968). Connecticut, as have a number of states, has adopted the definition of a trade secret which is set forth in the Restatement, 4 Torts § 757,

comment b. *Town & Country House & Homes Service, Inc. v. Evans,* 150 Conn. 314, 318, 189 A.2d 390 (1963); *Allen Mfg. Co. v. Loika,* 145 Conn. 509, 516, 144 A.2d 306, 309 (1958). The provision reads as follows:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers . . . [a] trade secret is a process or device for continuous use in the operation of the business.

■ Some of the factors to be considered in determining whether given information is a trade secret are:

(1) the extent to which the information is known outside the business;

(2) the extent to which it is known by employees and others involved in the business;

(3) the extent of measures taken by the employer to guard the secrecy of the information;

(4) the value of the information to the employer and his competitors;

(5) the amount of effort or money expended by the employer in developing the information;

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement, 4 Torts § 575, comment b, quoted with approval in *Town & Country House & Homes Service, Inc. v. Evans,* supra 150 Conn. at 319, 189 A.2d 390. See also *Wilson Certified Foods, Inc. v. Fairbury Food Prod., Inc.,* 370 F.Supp. 1081, 1083 (D.Neb.1974).

(A) *THE EXTENT TO WHICH THE INFORMATION IS KNOWN OUTSIDE THE BUSINESS*

■ Pressure Science advances broad claims that the procedures it uses in the production of C-seals are trade secrets. The weight of the evidence at trial, however, was to the contrary.

At the outset, it is appropriate to note that it seems evident Taylor and his associates honestly believed that their manufacturing methods were unique and secret. Perhaps their deep involvement in their own work insulated them from knowledge of and exposure to the rapid advancements in production techniques for metal seals that were occurring in other parts of the country. It appears that, until this trial, they rested assured, in the relatively secluded environment of their plant, that their processes were unknown to others and proprietary to them.

However, there is nothing esoteric or complex about the manufacturing equipment and techniques employed to make C-seals. As the findings of fact indicate, almost all of the methods used by Pressure Science were for many years utilized by or were known concepts to companies in the industry, including Advanced Products. At trial, Pressure Science adopted a position that the entire C-seal manufacturing process was a trade secret. Such a claim, particularly as it pertained to sources of supplies, use of a die to form the seal, welding the hoops, polishing, heat treating, electroplating and packaging, was clearly not established. Since the plaintiff's sincerity is not doubted, the Court must attribute these contentions to zeal and misinformation.

While it is true that prior to 1973, no company, other than Pressure Science made C-seals by die forming, this fact, in and of itself, is not sufficient to tip the scales in plaintiff's favor. The die has a very simple and basic design; and, as one of Pressure Science's key witnesses testified, it could be reproduced "in a minute" by an experienced engineer who viewed it opened. Two independent, impartial experts, Barton and Merwin, gave convincing testimony that their companies, upon request, could have easily designed and produced a die similar to Pressure Science's. Both men had extensive prior experience with the use of stops

in a die cavity and with dies in which part of the finished image was cut into each half of the die and the two matching halves were aligned by a center dowel pin. In addition, Advanced Products had the in-house personnel and capabilities to design and make a split die to manufacture C-seals. Cf. *Shatterproof Glass Co. v. Guardian Glass Co.*, 322 F.Supp. 854, 868 (E.D. Mich.1970). Prior to Kramer's employment, Sommer and Sniegowski had discussed and considered various forming methods, some of them identical to Taylor' early experiments, and had the split metal die technique on the drawing boards. Having worked extensively with the Servo-Flex seals, V-seals and roll formed C-seals, Sniegowski was familiar with all the procedures in welding twin Inconel strip and forming seals. In addition, the arts of polishing, heating, electroplating and TIG welding metal seals were known to them as well as to most scientists and engineers in the same and related businesses.

(B) *THE EXTENT TO WHICH THE PROCESS IS KNOWN BY EMPLOY-EES OF THE PLAINTIFF AND BY OTHER PERSONS IN THE PLAIN-TIFF'S BUSINESS*

In the early 1960's, Taylor worked with one paid employee and several part-time machinists to produce C-seals. By 1968, Taylor employed approximately 20 persons and had hired Bernard Sadoff, a graduate engineer; by 1975, Pressure Science had 90 employees. Continued C-seal production growth is anticipated by the company. It is unclear exactly how many of Pressure Science's employees became familiar with the C-seal manufacturing process, but it must be assumed that; in addition to Taylor, Sadoff, and Kramer, most of the employees could easily become acquainted with every step in the process. Despite the extraordinary turnover rate of 380 employees over the years, none was required to sign a non-disclosure agreement when hired. Compare *Sperry Rand Corporation v. Rothlein,* supra, 241 F.Supp. at 554. There was little or no evidence that most of the employees possessed special skills nor did the company appear to restrict knowledge of the C-seal manufacturing procedures to designated employees. Cf. *Wilson Certified Foods, Inc. v. Fairbury Food Prod., Inc.,* supra, 370 F.Supp. at 1085; *Future Plastics, Inc. v. Ware Shoals Plastics, Inc.,* 340 F.Supp. 1376, 1380–1381 (D.S.C.1972).

(C) *THE EXTENT OF THE MEASURES TAKEN BY THE PLAINTIFF TO GUARD THE SECRECY OF THE PROCESS*

Prior to June 1973, the rear portion of Pressure Science's plant was allocated to C-seal manufacture. Until recently two large sliding glass windows were located along the rear wall of the area which provided an uninterrupted view of the manufacturing process. In June 1973, these windows were removed. The die used to form the C-seals is made in Pressure Science's machine shop which is not located in the C-seal manufacturing area proper. The plant does not have a watchman but does have an alarm system which rings in the local police department.

Visitors were not permitted in the Pressure Science production area without an escort. Tours, however, were given of Pressure Science manufacturing facilities, including the C-seal area. During these tours, the plant was in operation and the use of a die in the forming of the C-seal was clearly visible to the observer. Some of the visitors possessed the knowledge and skill to duplicate the manufacturing process observed during these tours.

Although at the time Kramer was hired Pressure Science required nondisclosure agreements to be signed by some of its employees, Kramer was not asked to sign such an agreement. Moreover, there was no written procedure at Pressure Science that set forth a policy or practice of advising its employees that the company considered its C-seal process confidential or that the process should not be disclosed. Compare *Sperry Rand Corporation v. Rothlein,* supra, 241 F.Supp. at 555.

In view of the above, and in the light of the testimony of witnesses such as Robert

Russell, it appears that Pressure Science did not make significant efforts to maintain the secrecy of its C-seal manufacturing process or to guard against disclosure of that process to its competitors.

(D) *THE VALUE OF THE INFORMA-TION TO THE PLAINTIFF AND TO ITS COMPETITORS*

There is little question that Taylor is a dedicated, talented scientist and engineer. In the late 1960's, he realized that a metal seal in the shape of a "C" had distinct performance advantages over a metal seal with the configuration of an "O". He further recognized that making a C-seal by machining it from an O-seal was expensive and difficult. After much research, effort, and experimentation with various dies, he designed by 1965 a two-piece die to manufacture formed C-seals which were economically attractive to the market.

It is crucial to note, however, that at this time the demand for C-seals was minimal; and therefore, their production was of little interest to the metal seal industry in general. When other companies, such as Advanced Products, received an occasional order for small quantities of C-seals, the seals were machined from O-seals to satisfy the customer. Thus, Advanced Products had little interest in penetrating the relatively small market for C-seals and, in effect, was, content to leave the field solely to Pressure Science.

In the early 1970's, the owners of Advanced Products, the largest manufacture of O-rings in the world, noticed that the demand for C-seals was increasing and that C-seals were displacing O-rings in certain applications, particularly in the aircraft industry. It was apparent to Advanced Products that it could not profitably mass produce C-seals from finished O-rings because of the high unit cost associated with that method of manufacture. Naturally, Advanced Products considered alternate methods of manufacture; and, since it was common knowledge in the business that certain seals could be formed inexpensively by a die, it contemplated the utilization of a split

match metal die with half the "C" cut into the top and half the "C" cut into the bottom. Once Advanced Products decided to compete in the accelerating C-seal market, it could have, without Kramer, produced formed C-seals in competition with Pressure Science.

In certain applications the C-seal has distinct performance advantages over metal seals in other configurations, and the most economical and feasible methods to manufacture C-seals are by the procedures utilized by both parties. The growing demand for these seals will enable each of the parties to enjoy an active and profitable business and, at the same time, the market will gain the benefits resulting from free and open competition. Since the evidence disclosed that the plaintiff failed to establish any special process or combination of procedures so superior or so distinguishable as to warrant trade secret classification, the Court concludes that the value of the particular methods used by Pressure Science to produce C-seals is not significant.

(E) *THE AMOUNT OF EFFORT OR MONEY EXPENDED BY THE PLAINTIFF TO DEVELOP ITS PROCESS*

Taylor, for the most part working alone in the early years, did expend a great deal of effort and several thousand dollars to put together the procedures which produced a formed C-seal. But this fact cannot convert known concepts into trade secrets. Actually the time, money and effort invested in the business does not appear to be singular considering Taylor's initial part-time commitment to the project and his rather meager capitalization. Well-staffed and well-financed companies, such as Advanced Products, would have been able to produce formed C-seals on a production basis in a much shorter time than Pressure Science. In addition, most equipment and procedures for the manufacture of the formed C-seal were already in-house at Advanced Products as part of its large O-ring and other business methods.

**(F)** *THE EASE OR DIFFICULTY WITH WHICH THE PROCESS COULD BE PROPERLY ACQUIRED OR DUPLICATED*

As the findings of fact reveal, almost all of the procedures utilized to manufacture the C-seal were being used by Advanced Products in its O-ring business. Prior to May 1973, Advanced Products produced the desired "C" shape by machining or cutting out an O-ring. Thereafter, it heat treated, sized, stretched-formed, electroplated, polished and packaged the C-seal. When it decided to mass produce the C-seal, its engineers recognized that the desired "C" shape had to be formed rather than cut out from an O-ring. At that time, it had available the in-house expertise and equipment to accomplish its goal. Kramer's arrival on the scene expedited what was already a foregone conclusion and gave Advanced Products a needed project engineer and supervisor for that aspect of its business.

Kramer, by using his expertise to organize and supervise the effort, merely hastened Advanced Products' entry into the C-seal market on a production basis. To deny Kramer "the right to practice his trade by attempting to establish the general experience and knowledge of the employer as a trade secret when actually [Kramer's] knowledge and experience in his trade is a substantial contribution to this general process is not the type of situation within the contemplation of the law guarding the disclosure of trade secrets." *Cudahy Company v. American Laboratories, Inc.*, 313 F.Supp. 1339, 1345 (D.Neb.1970); see also *E. W. Bliss Company v. Struthers-Dunn, Inc.*, 408 F.2d 1108 (8 Cir. 1969). Under these circumstances, Kramer was entitled to seek employment immediately and freely with one of his former employer's competitors. Cf. *Republic Sys. & Program., Inc., v. Computer Assist. Inc.*, 322 F.Supp. 619, 627 (D.Conn.1970).

In addition, the literature on the subject and the availability of experienced tool and die makers, such as Barton and Merwin, provided additional avenues for Advanced Products to explore and readily obtain the necessary two-piece die to form the C-ring within a matter of a few months.

Finally, it is appropriate to comment on the procedure to form large C-seals where a die would not be practical. Pressure Science die-forms C-seals up to 20 inches in diameter; for larger seals, it uses roll forming. On the other hand, Advanced Products roll forms its C-rings if the diameter is 14 inches or larger. The evidence was clear that roll forming is a well known technique in the trade and that Advanced Products roll forms its C-rings on the roll formers, with some slight modifications, it used for many years in its O-ring manufacturing procedures.

Having considered the factors enumerated above, the Court must conclude that the plaintiff has failed to carry its burden of establishing that its production process techniques for C-seals are trade secrets. Cf. *Keystone Plastics, Inc. v. C & P Plastics, Inc.*, 340 F.Supp. 55, 61 (S.D.Fla.1972), aff'd, 506 F.2d 960 (5 Cir. 1975); *Sperry Rand Corporation v. Pentronix, Inc.*, 311 F.Supp. 910, 912 (E.D.Pa.1970); see also *Ferranti Electric, Inc. v. Harwood*, 43 Misc. 533, 251 N.Y.S.2d 612 (1964).

## IV. CONCLUSION

In summary, therefore, it is the Court's considered opinion that (1) Pressure Science does not possess a body of confidential and proprietary information with respect to its C-seal manufacturing process; (2) Advanced Products did not wrongfully appropriate, for its benefit, any trade secrets of Pressure Science with respect to the production of C-seals; and (3) Kramer did not breach his duties of loyalty and fidelity to Pressure Science. The Court further concludes that Advanced Products failed to carry its burden of proof on its counterclaim grounded on a theory of malicious prosecution or vexatious suit.

Accordingly, it is ordered that judgment is entered on the complaint for the defendants and judgment is entered on the counterclaim for the plaintiff.